**17-3585-cv**
*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term 2017

(Argued: December 15, 2017      Decided: February 23, 2018)

Docket No. 17-3585

NORTH AMERICAN SOCCER LEAGUE, LLC,

*Plaintiff-Appellant,*

v.

UNITED STATES SOCCER FEDERATION, INC.,

*Defendant-Appellee.*

————————

Before:      PARKER, WESLEY, and CHIN, *Circuit Judges.*

Appeal from a November 4, 2017 order of the United States District Court for the Eastern District of New York (Brodie, *J.*).

North American Soccer League, LLC ("NASL") appeals from the denial of its motion for a preliminary injunction seeking a Division II designation pending the resolution of its antitrust case against the United States Soccer Foundation, Inc. ("USSF"). We evaluate NASL's motion under the heightened standard applicable to mandatory preliminary injunctions. NASL has not demonstrated a clear likelihood of success on the merits of its antitrust claim against USSF under 15 U.S.C. § 1. Accordingly, we AFFIRM the order of the District Court denying NASL's motion for a preliminary injunction, and we REMAND the matter for further proceedings on the merits of NASL's claims.

_____

JEFFREY L. KESSLER, Winston & Strawn LLP, New York, NY (David G. Feher, New York, NY; Steffen N. Johnson, Heather L. Kafele, Christopher E. Mills, Washington, D.C., *on the brief*), *for Plaintiff-Appellant*.

GREGORY G. GARRE, Latham & Watkins LLP, Washington, D.C. (Lawrence E. Buterman, New York, NY; Christopher S. Yates, San Francisco, CA, *on the brief*), *for Defendant-Appellee*.

_____

2

WESLEY, *Circuit Judge*:

After the denial of its requested Division II designation for the 2018 season of men's professional soccer, the North American Soccer League, LLC ("NASL") filed an antitrust suit against the United States Soccer Federation, Inc. ("USSF"). NASL also moved for a preliminary injunction, seeking designation as a Division II league pending resolution of the suit. This opinion addresses that motion. We conclude NASL has not demonstrated a clear likelihood of success on the merits of its antitrust claim under the heightened standard applicable to mandatory preliminary injunctions. Accordingly, we affirm the judgment of the United States District Court for the Eastern District of New York, *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.* ("*NASL*"), No. 17-CV-05495, 2017 WL 5125771 (E.D.N.Y. Nov. 4, 2017) (Brodie, *J.*), denying NASL's motion for a preliminary injunction.

**I**

As the regional governing body for soccer in the United States and Canada, USSF designates leagues as Division I, II, or III according to USSF's Professional League Standards (the "Standards"). The Standards establish requirements that a league must meet to gain a divisional designation—also called a sanction—for a season of play. The more competitive the division, the higher the bar. For example, the 2008 Standards required that a Division I league have a minimum of ten teams distributed in at least three time zones; a Division II league have a minimum of eight teams in at least two time zones; and a Division III

3

league have a minimum of eight teams, with no time-zone requirement.

Soccer leagues apply to USSF to receive annual designations for the upcoming season of play by submitting reports demonstrating their compliance, or plans for compliance, with the Standards. Leagues may submit requests for waivers from compliance with the Standards' requirements. The USSF Board votes on divisional designations after reviewing the recommendations of USSF's Professional League Task Force ("Task Force"). The Board is composed of fifteen directors, two of whom are chosen by the professional leagues.

The same process applies for revising the Standards; the USSF Board works in conjunction with a Professional League Standards Task Force ("Standards Task Force").[1] Unchanged from 1996 to 2008, the Standards for all divisions were revised in 2008 and 2014, and for only Division II in 2010.[2]

The three most prominent men's professional soccer leagues have historically occupied their respective divisions in isolation. Major League Soccer, LLC ("MLS") has been the only Division I men's soccer league since MLS's start in 1995. NASL has existed since 2009 and has operated as a Division

---

[1] Individuals with current ties to any professional league cannot be on the Task Forces and must abstain from USSF Board votes on matters relating to the professional leagues.

[2] Amendments proposed in 2015 for Division I, to which NASL objected, never were adopted.

4

II league since 2011. The United Soccer Leagues, LLC ("USL") ordinarily has filled the Division III slot. According to NASL, it long has harbored aspirations to compete against MLS in Division I; in contrast, USL has been content as an MLS feeder league.

It often pays to be at the top, of course, and MLS has enjoyed competitive benefits as the top-tier league since its inception. Indeed, USSF, when establishing men's soccer in the United States, decided "to not sanction any other league as a [Division I] men's professional outdoor league until MLS had finished its second full season in 1997—to give it a 'runway' of sorts." Gulati Decl. ¶ 64. MLS's top-tier status has economic benefit as well. MLS and USSF have a "business relationship" through which Soccer United Market ("SUM"), a marketing company, has the rights to "bundle[d]" MLS and USSF sponsorship and broadcasting rights. Compl. ¶ 107; Gulati Decl. ¶ 230.[3]

Like the other leagues, NASL annually applies to USSF for a divisional designation. It operated as a Division II league for the 2011–2017 seasons, receiving compliance waivers for all but one season. Although NASL made a play for a Division I designation for 2016, its application was denied, and NASL operated as a Division II league (with waivers) for that season. For the 2018 season, NASL applied for a Division II designation, requesting waivers for the

---

[3] Under the agreement, which was extended for an eight-year term in 2015, SUM guarantees an annual amount of marketing revenue, plus additional revenue if SUM hits monetary targets. The bundling financially benefits both USSF and MLS.

minimum-team and time-zone requirements. The USSF Board rejected NASL's Division II application but gave NASL additional time to file for Division III status. NASL filed suit instead.

NASL contends that USSF conspired with its membership and related entities in adopting, amending, and applying its Standards in an anticompetitive manner to preclude NASL and other leagues from competing with MLS in the Division I market. *See* 15 U.S.C. §§ 1–2. NASL requests preliminary injunctive relief in the form of a Division II league designation and permanent relief enjoining USSF from promulgating the Standards to separate leagues into divisions.

NASL's motion for a preliminary injunction is tied to its allegations in the first count of its Complaint—that USSF violated 15 U.S.C. § 1 through a conspiracy to restrain competition. NASL asked the District Court for a preliminary injunction allowing it to operate as a Division II league. In a 49-page decision, the district court made detailed findings of fact and conclusions of law before concluding that NASL had not made a clear showing of entitlement to relief and denying the preliminary injunction. *NASL*, No. 17-CV-05495, 2017 WL 5125771, at *1, *21. NASL appeals, arguing the District Court abused its discretion in applying the preliminary injunction standard and in finding that NASL had not sufficiently showed its clear likelihood of success on the merits of its § 1 antitrust claim.

6

## II

This Court reviews a district court's legal rulings *de novo* and its ultimate denial of a preliminary injunction for abuse of discretion. *McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 867 (2005); *Almontaser v. N.Y.C. Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Almontaser*, 519 F.3d at 508.

### A. Applicable Standard for the Preliminary Injunction

Courts refer to preliminary injunctions as prohibitory or mandatory. Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it.[4] *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (internal citation omitted). A party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a

---

[4] We focus on the status quo rather than the "mandatory" and "prohibitory" terminology because "in borderline cases injunctive provisions containing essentially the same command can be phrased either in mandatory or prohibitory terms." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 835 (1994) ("'Do not strike,'" would appear to be prohibitory . . . [but] 'Continue working,' would be mandatory."); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds by O'Lone v. Estate of Shabaze*, 482 U.S. 342 (1987) ("In many instances, this distinction is more semantic[] than substantive.").

preliminary injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing "a clear or substantial likelihood of success on the merits." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted). The District Court concluded that NASL was seeking a mandatory injunction and imposed the heightened standard. *NASL*, No. 17-CV-05495, 2017 WL 5125771, at *7. NASL argues that using the heightened standard was error.

Because the proposed injunction's effect on the status quo drives the standard, we must ascertain the status quo— that is, "the last actual, peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam) (quoting *LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994)).[5] Before this litigation,

---

[5] The "status quo" in preliminary-injunction parlance is really a "status quo ante." *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 90 (2d Cir. 1983) (referring to reinstatement of benefits as "restoration of the *status quo ante*"); *accord O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (en banc) (per curiam) ("requir[ing] a party who has recently disturbed the status quo to reverse its actions . . . restores, rather than disturbs, the status quo ante, and is thus not an exception" to the ordinary standard for preliminary injunctions). This special "ante" formulation of the status quo in the realm of equities shuts out defendants seeking shelter under a current "status quo" precipitated by their wrongdoing.

8

USSF would regularly evaluate NASL's applications and determine NASL's divisional designation. The relationship of annual application, assessment, and sanction determination was the last uncontested status between the parties preceding the present controversy. This is how the parties operated, year after year.

NASL seeks to alter this near-decade-long relationship of annual sanctioning between the parties. Although NASL has never received a designation absent the annual process, it now requests a Division II designation for the duration of this litigation. NASL, looking to upend the federation–league sanctioning framework, seeks a mandatory injunction.

NASL argues that applying a heightened standard here would require applying that standard any time a party seeks an injunction to maintain "critical benefits" they have long received. Appellant's Br. 3. This case is different than the benefits-termination cases, however. In those cases, the status quo is one in which the plaintiff continues receiving previously granted benefits. *See Holt v. Cont'l Grp.*, 708 F.2d 87, 90 (2d Cir. 1983) (reinstating benefits restores the status quo ante); *see also Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 99–101, 107 (2d Cir. 2009) (permitting suspended students to continue attending school). Here, USSF decides anew each year which divisional designation applies to NASL, if any. NASL's Division II sanctions never last beyond one season of play. Unlike in the benefits-termination cases, the status quo here involves a periodic sanction of limited life.

"The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Conflating status with status quo, the parties center their arguments on NASL's status as a Division II league. However, the status quo is not that NASL regularly received a Division II designation, nor is it NASL's lack of a Division II designation for 2018. The status quo is the parties' pre-controversy position vis-à-vis the other.[6] Directing USSF to grant NASL a divisional designation for 2018 and beyond would alter that relationship.[7] NASL's request for a preliminary injunction

---

[6] Some of our sister circuits have explicitly incorporated this principle into their formulations of the status quo. *See, e.g.*, *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1100 (10th Cir. 1991), *overruled on other grounds by O Centro Espirita*, 389 F.3d at 975 ("The status quo . . . is defined by the reality of the existing status and relationships between the parties.") (emphasis omitted); *Stemple v. Bd. of Ed. of Prince George's Cty.*, 623 F.2d 893, 898 (4th Cir. 1980) ("[C]ourts . . . will frame any equitable relief to preserve the last uncontested status between the parties."); *Wash. Capitols Basketball Club, Inc. v. Barry*, 419 F.2d 472, 475 (9th Cir. 1969) ("maintain[ing] the status quo between the litigants") (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953)).

[7] The case might be different if USSF designated NASL a Division II league and revoked that designation mid-season. There, the status quo between the parties arguably would be NASL's Division II designation for that season, in which case we would evaluate NASL's challenge to USSF's revocation under the ordinary standard for a preliminary injunction.

10

was correctly analyzed by the District Court under the heightened standard for a mandatory injunction.[8]

## B. Clear Likelihood of Success on the Merits

NASL's claim is anchored in § 1 of the Sherman Act.[9] Section 1 prohibits "[e]very contract, combination . . . or conspiracy[] in restraint of trade or commerce." 15 U.S.C. § 1; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010). Thus, to establish a clear likelihood of success under

---

[8] NASL contends that, as an alternative to a showing of a clear or substantial likelihood of success, it can satisfy the higher standard by showing that failure to issue the injunction would result in extreme or very serious damage. It relies on our earlier statement "that a mandatory injunction should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Tom Doherty*, 60 F.3d at 34 (quoting *Abdul Wali*, 754 F.2d at 1025). Irreparable harm, however, is "indistinguishable" from extreme damage. *Jacobson & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 441 n.3 (2d Cir. 1977). Therefore, as we have previously noted, the extreme-damage language in our jurisprudence remains "merely a reaffirmation of the traditional reluctance to issue mandatory injunctions . . . ." *Id.*

[9] The District Court found that NASL had established irreparable harm and that the injunction would not harm the public interest. *NASL*, No. 17-CV-05495, 2017 WL 5125771, at *8–9, *21. USSF does not focus on a failure by NASL in either area. Thus, we start and finish with the lower court's determination that NASL had not demonstrated its clear likelihood of success on the merits.

11

its § 1 claim, NASL must show "there is a contract, combination . . . or conspiracy amongst separate economic actors pursuing separate economic interests such that the agreement deprives the marketplace . . . of actual or potential competition." *Am. Needle*, 560 U.S. at 195 (internal citations and quotation marks omitted).

NASL alleges that "USSF and co-conspirators MLS, USL and SUM have entered into a continuing agreement, combination, or conspiracy in restraint of trade with the purpose, intent and effect of restraining horizontal competition among top-tier [and second-tier] men's professional soccer leagues . . . ." Compl. ¶ 200. NASL asserts that the arrangement "enables MLS to be the only men's top-tier professional soccer league . . . by promulgating, revising, manipulating, and selectively granting and denying waivers from anticompetitive Professional League Standards so that MLS, and only MLS, will satisfy the USSF's requirements . . . to qualify for men's top-tier Division I sanctioning." Compl. ¶ 201.

### 1. Contract, Combination, or Conspiracy[10]

For an arrangement to be a conspiracy under § 1, it "must embody concerted action." *Am. Needle*, 560 U.S. at 191. Concerted action exists where there is an agreement between "separate economic actors pursuing separate economic interests." *Id.* at 195 (internal quotation marks omitted). The fact that the co-conspirators are capable, due to their separateness, of acting in concert is not sufficient. Proof of a conspiracy is required. *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).

A plaintiff must offer "direct or circumstantial evidence that reasonably tends to prove . . . a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Rarely do co-conspirators plainly state their purpose. As a result, courts often must evaluate circumstantial evidence of a conspiracy by weighing "plus factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."

---

[10] Because "[t]he question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade," *Am. Needle*, 560 U.S. at 186, we first examine, pursuant to NASL's allegations, whether USSF, MLS, USL, and SUM conspired within the meaning of § 1 of the Sherman Act. Although we ultimately assume the existence of a conspiracy, we address this antecedent question to clarify the framework the lower court must use on remand.

*United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (citation and internal quotation marks omitted). In *Monsanto*, the Supreme Court noted that courts should look for evidence that "tends to exclude the possibility that the [defendant was] acting independently." *Monsanto*, 465 U.S. at 764. In *Matsushita*, the Supreme Court elaborated on what this meant: "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

The District Court concluded that the USSF Board's promulgation of the Standards was not direct evidence of concerted action among USSF, the leagues, and SUM. According to the court, NASL needed to show there was "an agreement to agree to vote a particular way" before the Standards could satisfy the concerted-action requirement. *NASL*, No. 17-CV-05495, 2017 WL 5125771, at *10 (emphasis omitted). The court then evaluated circumstantial evidence of a conspiracy. Regarding the USSF Board's votes to adopt and amend the Standards as parallel conduct, the court examined whether there were plus factors demonstrating an antitrust conspiracy. *Id.* at *11. Although acknowledging that the SUM agreement poses "a conflict of interest," and describing as "troubling" USSF's admitted past intent to give MLS a head start in the industry, the District Court concluded that there was insufficient evidence of concerted action because the evidence did not tend to exclude the possibility of independent action. *Id.* at *11, *13, *15.

14

NASL argues that the District Court erred in applying the *Monsanto* standard for inferring a conspiracy because the Standards are direct evidence of a conspiracy. We disagree.

The *Monsanto-Matsushita* framework works here. *See Monsanto*, 465 U.S. at 764, 768; *Matsushita*, 475 U.S. at 588. Courts use this framework for assessing conspiracies, including those conspiracies provable by direct evidence. *See, e.g.*, *Monsanto*, 465 U.S. at 765 (finding substantial direct evidence of vertical price-fixing agreement). A plaintiff who can proffer direct evidence of a conspiracy should have no qualms with the *Monsanto-Matsushita* framework because direct evidence by definition shows the requisite concerted action. *See Cosmetic Gallery, Inc. v. Shoeneman Corp.*, 495 F.3d 46, 52 (3d Cir. 2015) ("'Direct' evidence must evince with clarity a concert of illegal action.").

Moreover, organizational decisions do not inherently constitute § 1 concerted action. NASL's argument misinterprets the meaning of concerted action in antitrust law. "[Not] every action by a trade association is . . . concerted action by the association's members." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (per curiam). Indeed, even though a "trade association by its nature involves collective action by competitors[,] . . . a trade association is not by its nature a 'walking conspiracy.'" *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988). Rather, it is when "a § 1 plaintiff establishes the existence of *an illegal* contract or combination" that the plaintiff can "proceed to demonstrate that the agreement constituted an unreasonable restraint of trade.'" *Capital Imaging*, 996 F.2d at 542

15

(emphasis added).  Evidence should "tend[] to show that association members, in their individual capacities, consciously committed themselves to a common scheme *designed to achieve an unlawful objective*."  *AD/SAT*, 181 F.3d at 234 (emphasis added).

In fairness to NASL, organizational decisions sometimes are § 1 concerted action.  For example, when there is direct evidence of an alleged conspiracy via an association's express regulation of its members' market.  In *Associated Press*, the government challenged as illegal a cooperative news association's by-laws that restricted membership and prohibited members from distributing news to nonmembers.  *Associated Press v. United States*, 326 U.S. 1, 5 (1945).  In ruling for the government, the Supreme Court endorsed the district court's conclusion that "[t]he by-laws of AP are in effect agreements between the members . . . . [They are] contracts in restraint of commerce." *Id.* at 11 n.6.  Similarly, in *Indiana Federation of Dentists*, the Supreme Court found that a federation's policy constituted a collective refusal to deal with insurers and was an illegal agreement.  *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457–58 (2009).  These cases corroborate the obvious—that direct evidence of an illegal "contract, combination, or conspiracy" satisfies § 1's concerted-action requirement.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988) (finding agreement, in violation of § 1, to subvert standard-setting process by packing vote); *see also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 601–02 (1972) (by-laws allocating market territory among chain members found anticompetitive); *Fashion Originators' Guild v. FTC*, 312 U.S.

16

457, 462–64 (1941) (Guild's rules and policies found anticompetitive where purpose was to prevent sales and create a monopoly).

If NASL were challenging the Standards themselves—in totality—as violative of the antitrust laws, then the USSF Board's promulgation of them would constitute direct evidence of § 1 concerted action in that undertaking.[11] As for

[11] How NASL is challenging the Standards is unclear. *See* A-135 (the District Court, with NASL's later agreement, summarized NASL's position as: "You're saying standards are okay, Division I, Division II is okay; the manner in which [USSF] set[s] the requirements for each is wrong"); *see also* A-137 (NASL stating "I'm challenging the requirements here . . . that a standard setting body should set [the minimum-team requirement] . . . [challenging] [t]hat particular rule"). There is room for disagreement as to whether NASL's reference to the Standards, as "effectuat[ing] the USSF's anticompetitive conspiracy," wages war on the Standards or just fires shots at their role in the larger alleged conspiracy. Compl. ¶ 122. *See Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 339–40 (1991) (Scalia, *J.*, dissenting) (describing an alleged agreement to boycott as "not the totality of the conspiracy, but merely the means used to enforce it"). *Compare Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 n.9 (7th Cir. 1990) (saying plaintiffs did not directly challenge standards alleged to "*perpetuate[]* the boycott"), *with Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 283, 288, 289 (4th Cir. 2012) (finding direct evidence of conspiracy where defendants used joint venture as an "instrumentality" and "conduit," saying that "board members conspired in the form of [their] rules, the very passage of which establishes that the defendants convened and came to an agreement").

the clearly alleged overarching conspiracy to restrain competition in markets for top- and second-tier men's professional soccer leagues in North America, the promulgation of the Standards is circumstantial evidence of that conspiracy. The District Court properly evaluated the Standards along with other circumstantial evidence of NASL's conspiracy allegations, concluding that NASL had not sufficiently shown the presence of concerted action. *See NASL*, 17-CV-05495, 2017 WL 5125771, at *11–15. But even assuming NASL's allegations show a conspiracy, NASL has failed to show that the agreement was an unreasonable restraint on competition under § 1.

## 2. Unreasonable Restraint

Only unreasonable restraints on competition violate § 1 of the Sherman Act. Courts use one of two tests here. "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be '*per se*' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" *Ind. Fed'n of Dentists*, 476 U.S. at 457–58. Regulation of league sports is a textbook example of when the rule of reason applies. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984).

NASL argues for an abbreviated, "quick look" version of the rule of reason,[12] which applies when "no elaborate industry analysis is required to demonstrate the

---

[12] The parties did not, and do not, dispute the rule of reason's applicability.

anticompetitive character of [the challenged] agreement." *Ind. Fed'n of Dentists*, 476 U.S. at 459 (internal quotation mark omitted). Here, however, far from being obviously anticompetitive, the Standards could be found to have a net procompetitive effect, or no competitive effect at all. *See Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999). Indeed, the Standards are seemingly designed to avoid a flaw in the relevant market: implosion of leagues due to minimal consumer demand and teams' financial instability. Because the alleged restraints might avoid a flaw in the market, the full rule-of-reason analysis applies. *See id.* (using three-step rule of reason when reviewing restrictions designed to address deceptive advertising in market prone to information gaps).

The District Court properly applied the three-step rule-of-reason framework. First, a plaintiff bears the initial burden of demonstrating that a defendant's challenged behavior can have an adverse effect on competition in the relevant market. *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016), *cert. granted*, *Ohio v. Am. Express Co.*, 138 S. Ct. 355 (Oct. 16, 2017) (mem.). Second, if the plaintiff satisfies this initial burden, the burden shifts to the defendant, who must demonstrate the procompetitive effects of the challenged restraint. *Id.* at 195. Third, if the defendant provides that proof, the burden shifts back to the plaintiff to show that these "legitimate competitive benefits . . . could have been achieved through less restrictive means." *Id.* (internal quotation marks omitted). Ultimately, "[t]he true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes

competition or whether it is such as may suppress or even destroy competition." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978) (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918)).

Under the first step of the rule of reason, a plaintiff must demonstrate that the alleged restraint has an adverse effect on competition. *Am. Express*, 838 F.3d at 194. The plaintiff can do this directly, by showing an "actual adverse effect on competition as a whole in the relevant market." *Id.* (emphasis omitted) (internal quotation mark omitted) (giving examples of higher prices or reduced output).[13] Or the plaintiff can make her case indirectly, "by showing that the defendant has sufficient market power to cause an adverse effect on competition." *Id.* (internal quotation marks omitted). Plaintiffs seeking to show adverse effect indirectly must demonstrate both the defendant's market power and "other grounds" for believing the challenged restraint harms competition. *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 183–84 (2d Cir. 2016). These other grounds might include price increases, reduced output or market quality, significantly heightened barriers to entry, or reduced consumer choice. *Id.* at 183 & n.42, 184, 186 n.56.

The District Court did not err in finding that NASL indirectly established an adverse effect on competition in

---

[13] The District Court found that NASL had not directly shown an actual adverse effect on competition in the market. *NASL*, 17-CV-05495, 2017 WL 5125771, at *18 & n.41 (no customer confusion and no reduced output beyond NASL's own exclusion from Division II).

"the market for (1) top-tier and (2) second-tier men's professional soccer leagues located in the United States and Canada." *NASL*, 17-CV-05495, 2017 WL 5125771, at *17 & n.40.[14]  USSF's market power is evident in its "power to . . . exclude competition" through the Standards. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).  And the ratcheting up of the Standards over the last two decades imposes increasingly "significant barriers to entry" in the relevant soccer market. *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999); *see also MacDermid*, 833 F.3d at 183–84, 186 n.56.

The burden then shifts to USSF to offer evidence of the Standards' procompetitive effects. *See Am. Express*, 838 F.3d at 195.  Although fraught with anticompetitive potential, standards promulgated by standard-setting organizations can be flush with "significant procompetitive advantages." *See Allied Tube*, 486 U.S. at 501.  "The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." *Capital Imaging*, 996 F.2d at 543 (quoting *Chi. Bd. of Trade*, 246 U.S. at 238).

The District Court also did not err in finding that USSF offered sufficient evidence of the Standards' procompetitive virtues. *See NASL* 17-CV-05495, 2017 WL 5125771, at *18–19 (considering minimum-team count, time zones, market size, stadium capacity, and financial viability).  The court found

---

[14] The District Court defined the market as proposed by NASL, and the parties do not contest this definition.  In light of that consensus, we regard the relevant market to be the same.

that the minimum-team requirement increases output through sustained fan interest and provides stability because larger leagues are less likely to collapse. *Id.* at *19. The court further found that the time-zone and market-size requirements generate fan and media interest, and, along with the stadium-capacity requirement, promote league quality. *Id.* The court lastly determined that the financial-viability requirements keep fans interested, stabilize the leagues financially, and prevent free riding. *Id.* These findings by the District Court are not clearly erroneous. *See Almontaser*, 519 F.3d at 508.

The Standards further benefit the market by coordinating necessary competition. As the Supreme Court recognized when addressing the National Collegiate Athletic Association's ("NCAA") role in regulating intercollegiate athletics, "this case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Bd. of Regents*, 468 U.S. at 101; *see also id.* at 102 ("[The NCAA's] actions widen consumer choice—not only the choices available to sports fans but also those available to athletes—and hence can be viewed as procompetitive.").

NASL argues that the District Court erred in finding some of the Standards' requirements justified in part by their procompetitive effects of eliminating free riding and stabilizing the market. However, it is permissible for courts to consider free riding and stability as two potential procompetitive justifications in the standard-setting context.

Eliminating free riders can be a procompetitive advantage of alleged restraints on competition like vertical price agreements. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 889–92 (2007) (discussing free riding and other procompetitive justifications). The same holds true in the standard-setting context. Here, the District Court did not err in finding that the Standards reduce leagues' incentive to free ride on USSF's efforts and expenditures without making similar investments to generate fan interest in the sport. *NASL*, 2017 WL 5125771, at *19.

Courts can also consider whether evidence of a defendant's stabilizing behavior constitutes a procompetitive benefit of standard-setting. NASL argues that anticompetitive behavior cannot be justified as preventing "[r]uinous competition, financial disaster, [or the] evils of price cutting." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940). However, that logic is tied to cases where courts were confronted with per se illegal practices. Per se illegal practices, like horizontal price-fixing, are those that "because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Though courts might reject the stability rationale where conduct is so anticompetitive as to be beyond redemption, *see Socony-Vacuum*, 310 U.S. at 228, that and other procompetitive justifications still can be relevant elsewhere—as in the sports standards context.

A defendant cannot, of course, justify anticompetitive arrangements by saying an industry's "special characteristics" warrant them. *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 689. But in the context of a soccer industry historically prone to collapse, the free-rider and stability justifications do not rationalize anticompetitive effects—they evince procompetitive ones. Specifically, as USSF urges, the Standards avoid free riders on, and lock in consumer interest for, the relevant competitive market. *See Bd. of Regents*, 468 U.S. at 117 ("[M]ost of the regulatory controls of the NCAA are justifiable means of fostering competition among amateur athletic teams and *therefore procompetitive because they enhance public interest in intercollegiate athletics*.") (emphasis added).

NASL separately argues that the District Court should have concluded NASL was clearly likely to succeed on the merits once the court found problems with the SUM agreement and USSF's early use of the Standards to favor MLS. *NASL*, No. 17-CV-05495, 2017 WL 5125771, at *11, *13. As the District Court noted, however, USSF's voting procedures and early history are a far cry from the collusive activity that would warrant per se antitrust analysis. *See Allied Tube*, 486 U.S. at 501 (excluding product by packing the annual meeting vote); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 775 (2d Cir. 2016) (acting collusively by circumventing LIBOR-setting rules). NASL has not shown a meaningful financial conflict of interest stemming from the SUM agreement; Board members with ties to professional leagues do not participate in the Task Forces and must abstain from votes regarding the Standards. As for USSF sheltering MLS

from competition in the mid-1990s, USSF's alleged co-conspirator leagues did not yet exist. Any anticompetitive promulgation or misuse of the Standards would be attributable to USSF alone. And unilateral action does not violate § 1 of the Sherman Act. *Am. Needle*, 560 U.S. at 190–91; *see also United States Football League v. Nat'l Football League*, 842 F.2d 1335, 1372 (2d Cir. 1988) (saying prior judgments against defendant, "admitted as evidence of a longstanding conspiracy," were "at best marginally probative of an ongoing intent to exclude competitors").

Because USSF has demonstrated procompetitive effects of the Standards, the burden shifts to NASL to prove that "any legitimate competitive benefits offered by [USSF] could have been achieved through less restrictive means." *Am. Express*, 838 F.3d at 195 (internal quotation mark omitted). Less restrictive alternatives are "those that would be less prejudicial to competition as a whole." *Capital Imaging*, 996 F.2d at 543. The District Court did not err in concluding that NASL failed to demonstrate viable less restrictive alternatives to the current Standards.

NASL points to the earlier renditions of the Standards as less restrictive alternatives to the current version of the Standards.[15] NASL notes, for example, that the Standards' eight-team requirement for Division II is less restrictive than its current twelve-team requirement. Having fewer requirements generally is less restrictive than having more. But NASL fails to show how reverting to earlier versions of

---

[15] By making this argument, NASL apparently concedes that the earlier Standards had procompetitive justifications.

the Standards would achieve the same legitimate procompetitive objectives as the Standards' current form. The Standards' evolution could show simply that its earlier renditions were no longer viable. Growing industries have developing standards; antitrust plaintiffs cannot just point to earlier standards as less restrictive alternatives without additionally showing the equivalent viability of the alternatives proffered.

NASL also urges that eliminating the Standards—using league rules instead of federation rules—is a less restrictive alternative. Again, we fail to see that leagues-based rules would accomplish the same ends as those issued by a federation. As the Supreme Court said of the NCAA's regulating function in intercollegiate sports, "[w]hat the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed." *Bd. of Regents*, 468 U.S. at 102. The same holds true here.

### III

NASL has a case left to make. But we cannot say at this point that NASL has shown a clear likelihood of its success on the merits under 15 U.S.C. § 1. Accordingly, the order of the District Court denying NASL's motion for a preliminary injunction is **AFFIRMED**, and the matter is **REMANDED** for further adjudication of this case on the merits.