*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*

In the
# United States Court of Appeals
### For the Second Circuit

————

AUGUST TERM 2023
ARGUED: SEPTEMBER 19, 2023
DECIDED: MARCH 18, 2024

No. 23-690

TIMOTHY DAILEADER,
*Plaintiff-Appellant*,

*v.*

CERTAIN UNDERWRITERS AT LLOYDS LONDON SYNDICATE 1861,
Subscribing to Policy No. ANV122398A, CRUM & FORSTER SPECIALTY
INSURANCE COMPANY, CERTAIN UNDERWRITERS AT LLOYDS,
Subscribing to Policy Number, DOH00746111, STARSTONE SPECIALTY
INSURANCE COMPANY,
*Defendants-Appellees*.

————

Appeal from the United States District Court
for the Southern District of New York.

————

Before: WALKER, CHIN, AND NARDINI, *Circuit Judges*.

————

Plaintiff-Appellant Timothy Daileader was the independent director and manager of an affiliated group of companies (together, "Oaktree") in distress. Defendants-Appellees Certain Underwriters at Lloyds London Syndicate 1861, along with the other Defendants-

Appellees, provided Oaktree with directors and officers liability insurance. Daileader is now defending himself in litigation involving Oaktree and seeks coverage from Syndicate 1861 for his defense. Syndicate 1861 denied Daileader's insurance claim. Daileader then sought a preliminary injunction to enforce Syndicate 1861's duty to defend. The district court (Gardephe, *J.*) denied Daileader's motion, and Daileader appealed. We hold that the district court did not abuse its discretion in doing so. We therefore **AFFIRM** the district court's order.

————

RAYMOND A. MASCIA JR. (William G. Passannante, Ethan W. Middlebrooks, *on the brief*), Anderson Kill P.C., New York, NY, *for Plaintiff-Appellant Timothy Daileader*.

RAFAEL RIVERA, JR. (Gary L. Gassman, *on the brief*), Cozen O'Connor, New York, NY, *for Defendants-Appellees Certain Underwriters at Lloyds London Syndicate 1861, Subscribing to Policy No. ANV122398A*.

————

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff-Appellant Timothy Daileader was the independent director and manager of an affiliated group of companies (together, "Oaktree") in distress. Defendants-Appellees Certain Underwriters at Lloyds London Syndicate 1861, along with the other Defendants-Appellees, provided Oaktree with directors and officers liability insurance. Daileader is now defending himself in litigation involving

Oaktree and seeks coverage from Syndicate 1861 for his defense. Syndicate 1861 denied Daileader's insurance claim. Daileader then sought a preliminary injunction to enforce Syndicate 1861's duty to defend. The district court (Gardephe, *J.*) denied Daileader's motion, and Daileader appealed. We hold that the district court did not abuse its discretion in doing so. We therefore **AFFIRM** the district court's order.

## BACKGROUND

Daileader's dispute began with Oaktree's troubles. Oaktree's three affiliated healthcare companies were owned by Daniel McCollum. Starting in 2015, the United States and several *qui tam* relators brought suit against McCollum and Oaktree, alleging that Oaktree had been fraudulently mismanaged. McCollum eventually admitted in a civil proceeding to violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. App'x 176, 208. He also entered a plea agreement in a criminal prosecution for conspiracy to pay illegal kickbacks and to defraud government healthcare programs. App'x 210. In January 2018, with litigation against Oaktree pending, Oaktree defaulted on multiple loans. Between July and December 2018, Oaktree's lenders appointed Daileader as the independent director and/or manager of the various Oaktree entities.[1] Daileader assumed these roles through his employer, Drivetrain, LLC, which

---

[1] In July 2018, Daileader was appointed as sole director and sole manager of Oaktree Medical Centre, PC and LabSource, LLC. In December 2018, he was appointed as co-manager with McCollum of Oaktree Medical Center, LLC. In June 2019, he became Oaktree Medical Center's sole manager, when the lenders removed McCollum as a co-manager.

places investment professionals as independent directors of financially distressed companies.

Oaktree's distress soon put Daileader at risk of personal liability. In September 2019, each of the Oaktree entities filed for Chapter 7 bankruptcy. In April 2021, the Chapter 7 Trustee sent a demand letter to Daileader alleging, among other things, that Daileader had breached his fiduciary duties to Oaktree by failing to file for Chapter 11 restructuring. The demand letter alleged damages ranging from $38 million to $925 million. In September 2021, the Trustee initiated adversary proceedings against Daileader and others in the U.S. Bankruptcy Court for the District of South Carolina, where Oaktree's Chapter 7 bankruptcy case was pending.[2]

Oaktree had purchased insurance protecting its directors and officers against some litigation expenses. Non-party Landmark American Insurance Company sold Oaktree a $1 million primary directors and officers ("D&O") policy. Defendants-Appellees each sold Oaktree a "follow form" excess policy adopting the primary policy's terms. Syndicate 1861 provided a first layer of excess coverage up to $1 million; the other excess insurers cumulatively provided another $8 million in coverage. Each of these policies includes a "duty to defend." This means, among other things, that the insurance covered certain litigation costs arising from suits against Oaktree's directors and officers. The parties do not dispute that Daileader is among those insured by Oaktree's D&O policies.

---

[2] The Trustee filed three substantively identical adversary complaints, one for each of the three Oaktree entities.

4

The parties do dispute whether the policies cover the current adversary proceedings. From the outset, primary insurer Landmark agreed to defend Daileader. But after Landmark's insurance was exhausted, Syndicate 1861 denied Daileader coverage, invoking the policies' "Bankruptcy/Insolvency Exclusion" provision. In general terms, that provision excludes from coverage any claim against Daileader arising from a wrongful act alleged to have contributed to Oaktree's bankruptcy. *See* App'x 54. According to Syndicate 1861, the Trustee had alleged in its adversary complaints that Daileader's wrongful acts caused Oaktree to lose money and, ultimately, to file for Chapter 7 bankruptcy.

On March 18, 2022, Daileader sued Syndicate 1861 and the other excess insurers in the U.S. District Court for the District of South Carolina, invoking that court's federal-question, bankruptcy, and supplemental jurisdiction. Daileader sought a preliminary injunction directing Syndicate 1861 to defend him in the adversary proceedings. He argued that (1) the Bankruptcy/Insolvency Exclusion did not apply to the claims in the adversary proceedings, and (2) insofar as the Exclusion did apply, it was an "*ipso facto* clause" that could not be enforced consistent with the federal Bankruptcy Code. On June 27, 2022, Daileader's suit was transferred to the U.S. District Court for the Southern District of New York.

On April 20, 2023, the district court denied Daileader's preliminary-injunction motion. The court concluded that Daileader (1) was seeking a mandatory rather than a prohibitory injunction, and therefore needed to meet a heightened standard to obtain preliminary relief; (2) had not shown he would be irreparably harmed by denial of such relief; and (3) had not shown he was likely to prevail on the merits of his claim. Daileader timely appealed.

On November 15, 2023, we summarily affirmed the district court's order, explaining that "at minimum, Daileader [had] not establish[ed] that irreparable harm would result in the absence of an injunction." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, No. 23-690-cv, 2023 WL 7648381, at *1 (2d Cir. Nov. 15, 2023). We indicated that an opinion would follow in due course. We now provide that opinion and explain that the district court was correct on all three issues.[3] The district court therefore did not abuse its discretion in denying Daileader's motion for a preliminary injunction.

## DISCUSSION

We "review[] a district court's legal rulings *de novo* and its ultimate denial of a preliminary injunction for abuse of discretion." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id.* (internal quotation marks and citation omitted).

Our decision here rests ultimately upon federal law. The Syndicate 1861 policy provides that New York law will govern questions concerning its validity, interpretation, performance, and enforcement. App'x 111. We therefore follow New York law in analyzing the policy. However, "[t]he question whether a preliminary injunction should be granted is generally one of federal

---

[3] On December 11, 2023, after we had issued our order summarily affirming the district court, Daileader informed this court through counsel that he had entered into a settlement agreement with the Trustee in the adversary proceedings, which he claimed rendered this appeal moot. We disagree. "[T]he mootness doctrine does not require . . . that we . . . refrain from issuing this opinion." *In re Grand Jury Investigation*, 399 F.3d 527, 528 n.1 (2d Cir. 2005).

law . . . , though state law issues are sometimes relevant to the decision to grant or deny." *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987); *accord* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2943 (3d ed. 2023).

## I.    The District Court Applied the Correct Standard for Issuing a Preliminary Injunction.

In general, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (internal quotation marks and citation omitted). Only the first two of these factors are relevant here. These requirements are demanding, for "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 666–67 (internal quotation marks and citation omitted).

In some situations, the likelihood-of-success and irreparable-harm requirements become more demanding still, requiring that the plaintiff "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (emphases added) (internal quotation marks and citations omitted). One situation when this heightened standard applies is when the plaintiff "seeks a so-called 'mandatory injunction,'" *JTH Tax*, 62 F.4th at 667, rather than a "prohibitory" one, *N. Am. Soccer League*, 883 F.3d at 36. At their most basic, the former typically requires the non-

movant to take some action, whereas the latter typically requires the non-movant to refrain from taking some action.  *See id.*

Whether an injunction is "mandatory" or "prohibitory" is sometimes unclear.  In "borderline cases," essentially identical injunctions "can be phrased either in mandatory or prohibitory terms."  *Id.* at 36 n.4 (internal quotation marks and citation omitted).  We have therefore explained that "[p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it."  *Id.* at 36.  In this context, the "status quo" is really the "status quo *ante*" – that is, "the last actual, peaceable[,] uncontested status which preceded the pending controversy."  *Id.* at 37 & n.5 (internal quotation marks and citation omitted).

We observed in *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.* that "breach of contract cases" such as this one can often provoke disputes about the "status quo."  60 F.3d 27, 34 (2d Cir. 1995).  That is because "[a] plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed.  A defendant's view of the status quo is its continued failure to perform as the plaintiff desires."  *Id.*  Thus, "[t]o a breach of contract defendant, any injunction requiring performance may seem mandatory."  *Id.*

The parties here disagree as to the status quo *ante* along much these lines.  Daileader notes that Landmark paid for his defense expenses in the adversary proceedings up until the coverage limit of that first-layer policy was exhausted. He therefore argues that the Syndicate's refusal to continue paying under its own policy upset the status quo of ongoing payments.  By contrast, Syndicate 1861 observes that it "never paid defense costs to Daileader and . . . consistently denied coverage."  Appellees' Br. 11.  Thus, it contends

that being compelled to pay Daileader's defense costs would alter *that* status quo.

We agree with the Syndicate. The Syndicate has never paid for any of Daileader's defense costs. Therefore, the "actual" status quo *ante* between the parties to this lawsuit was one of non-payment. *N. Am. Soccer League*, 883 F.3d at 37 (internal quotation marks omitted). This status quo was also "peaceable" and "uncontested." *Id.* (internal quotation marks omitted). It is true that Landmark had paid for Daileader's expenses. But Landmark's payment decision could not bind the Syndicate. Nor did the Syndicate ever agree that its policy would cover Daileader's costs in the adversary proceedings. The parties' rights and obligations under the policy were therefore unsettled. Accordingly, Daileader's suggestion that an injunction would only "enforce what Syndicate 1861 already was obligated to do" is unpersuasive. Appellant's Br. 24. Rather, what the Syndicate was "obligated to do" is precisely what the parties could have disputed then and still dispute now. Injunctions to enforce such contested duties will very often involve "commanding some positive act" and therefore will be mandatory, not prohibitory.[4] *Tom Doherty Assocs.*, 60 F.3d at 34. This case presents no exception.[5]

Daileader notes some cases suggesting a contrary result, but they do not alter our conclusion. Like this case, *In re WorldCom, Inc.*

---

[4] We emphasize that this analysis applies to affirmative *duties*, not to generalized *rights*. Where the latter are in dispute, an injunction to prevent the exercise of those rights may well often be prohibitory, rather than mandatory.

[5] Though it is not at issue here, we note that our selection of the relevant status quo might differ if the Syndicate's conduct were either legally unjustifiable or undertaken in bad faith. That is because we are inclined to "shut[] out defendants seeking shelter under a current 'status quo' precipitated by their [own] wrongdoing." *N. Am. Soccer League*, 883 F.3d at 37 n.5. Put differently, such a

*Securities Litigation*, 354 F. Supp. 2d 455 (S.D.N.Y. 2005), involved a preliminary injunction to enforce an insurer's duty to defend. There, the district court found the injunction to be prohibitory because it would require the defendant only "to do what it should have done earlier." *Id.* at 463 (internal quotation marks and citation omitted). But the insurer in *WorldCom* did not dispute that it owed the claimant a duty to defend. Rather, the insurer argued that the policy was void *ab initio* due to the policyholder's alleged fraud. *See id.* at 466–67. The insurer's denial thus represented a departure from the presumed contractual status quo, not an extension of it. Syndicate 1861's actions here cannot be similarly characterized.

*WorldCom* relied upon another pertinent case: *Johnson v. Kay*, 860 F.2d 529 (2d Cir. 1988). There, we described as prohibitory an injunction requiring a labor union to distribute mailings supporting a dissident faction in an upcoming internal referendum. *See id.* at 541. We acknowledged that such relief "was mandatory in the sense that the order required the union to expend funds it perhaps otherwise would not have spent." *Id.* But, consistent with our analysis here, we reasoned that the union had an obligation antedating any referendum to "open channels of communication to dissenting views." *Id.* That the union blocked those channels therefore disrupted the relevant status quo. Moreover, the alternative to the district court's injunction might well have been far more onerous: preventing the referendum altogether. *See id.* at 540. In this context, requiring "open channels of communication" demanded relatively little of the union. It would have made little sense to impose a more stringent standard before

---

status quo could not be viewed as either "peaceable" or "uncontested." *Id.* at 37 (internal quotation marks omitted).

issuing the less burdensome injunction. *Johnson* therefore does not compel us to treat Daileader's desired injunction as prohibitory.

In sum: Daileader seeks a preliminary injunction to require the Syndicate to pay for his defense costs. But the last, peaceable status quo between the two parties was one in which the Syndicate had never paid those costs. We must therefore evaluate Daileader's preliminary-injunction motion under the more stringent standard applicable to "mandatory" relief.

## II. The District Court Did Not Abuse Its Discretion in Denying Daileader a Preliminary Injunction.

Having determined that Daileader seeks mandatory relief, we now inquire whether he has (1) "ma[de] a strong showing of irreparable harm" and (2) "show[n] a clear or substantial likelihood of success on the merits." *Actavis*, 787 F.3d at 650 (internal quotation marks and citations omitted). We conclude that Daileader has done neither. Therefore, the district court did not abuse its discretion by refusing to issue a preliminary injunction.

### A. Daileader Has Not Made a Strong Showing of Irreparable Harm.

We begin with "the single most important prerequisite for the issuance of a preliminary injunction": irreparable harm. *JTH Tax*, 62 F.4th at 672 (internal quotation marks and citation omitted).

Daileader's burden here is substantial. Even under the ordinary standard for prohibitive relief, the party seeking a preliminary injunction must demonstrate that irreparable harm is not only "possib[le]" but "likely." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted). Under the heightened standard

applicable here, that party must make a "strong showing" that he will be irreparably harmed. *Actavis*, 787 F.3d at 650

Daileader has not met this burden. Injury is not irreparable when "a monetary award" may provide "adequate compensation." *Tom Doherty Assocs.*, 60 F.3d at 37 (internal quotation marks and citation omitted). Daileader alleges just such an injury. Unless and until he prevails at trial, he — and not Syndicate 1861 – must pay for his defense costs in the adversary proceedings. But if Daileader does ultimately prevail, he would be entitled to damages compensating just those costs. Of course, Daileader wishes to have those funds now rather than later. But compensation need only be "adequate" for preliminary relief to be unwarranted, not perfect.

Daileader claims his defense in the adversary proceedings has been impaired by Syndicate 1861's denial of coverage. However, he has not substantiated this assertion. Daileader's counsel submitted an affidavit in the adversary proceedings stating that "Daileader's unpaid defense costs . . . exceed $200,000 and are mounting" and that "Syndicate 1861's refusal to honor its obligation to pay defense costs has . . . prevent[ed] . . . counsel from conducting . . . important depositions, and . . . from conducting a thorough and effective review of thousands of pages of materials." App'x 816–18. Even crediting that statement, (1) Daileader does not contend that he lacks the money to pay for his defense and (2) it does not follow that he is unable to pay. Daileader may well have the funds but be unwilling to spend them and on that issue the affidavit is silent.

In essence, Daileader invites us to announce a new exception to our usual irreparable-harm principle: "as a matter of law, [t]he failure to receive defense costs when they are incurred constitutes an immediate and direct injury," satisfying the irreparable harm

requirement. Appellant's Br. 26 (internal quotation marks omitted) (quoting *WorldCom*, 354 F. Supp. 2d at 469). We decline his invitation.

Our discussion of *WorldCom* above is pertinent once more. That case involved a prohibitory injunction, not a mandatory one, and therefore demanded less from the party seeking relief. Moreover, the insurers in *WorldCom* challenged the policies' validity generally, but not the scope of their duty to defend. *See* 354 F. Supp. 2d at 466–67. The policyholder therefore had especially strong reliance interests at stake in the preliminary enforcement of the duty to defend. *See id.* at 470. *WorldCom* remains good law, but it announced no new general rule with respect to irreparable harm, much less one binding upon this court.

**B. Daileader Has Not Shown a Clear or Substantial Likelihood of Success on the Merits.**

Daileader's failure to demonstrate irreparable harm suffices for us to sustain the district court's order. But he has also not shown a clear likelihood of success on the merits of his breach-of-contract claim. This provides a second, independent basis for denying preliminary relief.

**1. Daileader Has Not Clearly Shown that the Bankruptcy/Insolvency Exclusion Likely Does Not Apply to the Adversary Proceedings.**

Daileader's principal merits argument concerns the application of the Bankruptcy/Insolvency Exclusion to the Trustee's adversary proceedings. The Bankruptcy/Insolvency Exclusion eliminates coverage for certain "Claims" against the insured "[a]lleging, arising out of, based upon, attributable to, or in any way involving, directly

13

or indirectly, in whole or in part" certain "[w]rongful [a]ct[s]." App'x 54.[6]

The Trustee alleged that Daileader "made no attempt to coordinate a sale or refinance of the Debtors and did not even begin a

---

[6] The Exclusion states:

The **Insurer** shall not be liable to make any payment for **Loss** under this policy in connection with any **Claim** made against the **Insured**:

1.    Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any **Wrongful Act** that is alleged to have caused, directly or indirectly, in whole or in part:

    a.    The bankruptcy or insolvency of the **Insured Organization**; [or]

    b.    The **Insured Organization**'s filing of a petition, or a petition being filed against the **Insured Organization** pursuant to the federal Bankruptcy Code or any similar state law . . . .

2.    Alleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, the **Insured Organization** having sustained a financial loss due to a **Wrongful Act** by or on behalf of any **Insured Person** that actually or allegedly occurred before the date that the **Insured Organization** or other party sought protection of the **Insured Organization**[']s assets . . . .

3.    Brought or maintained on behalf of any creditor or debt-holder of the **Insured Organization**, or any **Claim** arising out of any actual or alleged **Wrongful Act**, where such **Wrongful Act** actually or allegedly results in the **Insured Organization's** failure, refusal or inability to pay debts or amounts due and owing, including but not limited to **Claims** alleging misrepresentation in connection with any extension of credit or in connection with the purchase or sale of a debt instrument, or **Claims** alleging any **Wrongful Acts** where such **Wrongful Acts** actually or allegedly result in the deterioration in the value of any debt instrument or security as a result of, wholly or in part the bankruptcy or insolvency of the **Insured Organization**.

App'x 54 (words and phrases in bold represent terms defined by the policy).

14

corporate restructuring." App'x 292. Instead, "[a]s the Debtors' assets were quickly depleted and the liabilities grew, [Daileader and his codefendants] collected professional fees totaling nearly $5 million." *Id.* When "there were no more funds to pay those fees," Daileader filed for chapter 7 liquidation on behalf of the debtors. *Id.; see also id.* at 315–17. These allegations underlay seven causes of action, some under state law and others under the Bankruptcy Code. *See id.* 317–39.

The crucial issue, then, is whether the adversary proceedings were "Claims" excluded from coverage. Citing New York contract law, Daileader argues that if the policy provides coverage against any of the Trustee's causes of action, then Syndicate 1861 must defend against them all. Relying upon the contract, the Syndicate insists upon the inverse: if the policy excludes from coverage any of the Trustee's causes of action, then the Syndicate need not defend Daileader against any of them.

We believe that Syndicate 1861 has the better argument. As relevant here, the policy defines a "Claim" as a "civil . . . proceeding," rather than as a cause of action within a proceeding. App'x 63. Moreover, the Bankruptcy/Insolvency Exclusion applies to "any Claim . . . [a]lleging, arising out of, based upon, attributable to, or in any way involving, directly or indirectly, in whole or in part, any" otherwise-excludable "Wrongful Act." App'x 54. Daileader does not – and could not – seriously dispute that the Trustee alleged "Wrongful Acts" within the meaning of the policy. Thus, the adversary proceedings were civil proceedings arising in part out of

15

otherwise-excludable conduct – precisely what the Exclusion contemplates.

This plain contractual language defeats Daileader's invocation of general New York contract principles. Daileader contends that an exclusion to a duty to defend applies only where allegations lie "wholly within the exclusion." Appellant's Br. 42 (quoting *Westpoint Int'l, Inc. v. Am. Int'l S. Ins. Co.*, 71 A.D.3d 561, 562 (1st Dep't 2010) (internal quotation marks omitted)). *Westpoint* further indicates that defining "'Claim' to mean lawsuit" does not automatically permit denying coverage where some allegations may be covered and others not. 71 A.D.3d at 562. But the exclusion in *Westpoint* was not so sweeping as the one at issue here: it did not extend to claims "in any way involving . . . in whole or in part" the conduct in question. App'x 54; *see Westpoint Int'l, Inc. v. Am. Int'l S. Ins. Co.*, No. 116832/07, 2009 WL 2207520 (N.Y. Sup. Ct. July 13, 2009) (quoting the exclusion). In this case, New York contract law's powerful default rules have likely been overcome by the policy's express terms.

### 2. Daileader Has Not Clearly Shown That the Bankruptcy/Insolvency Exclusion Likely Violates the Bankruptcy Code.

Daileader also contends that, to the extent the Bankruptcy/Insolvency Exclusion does apply to the adversary proceedings, it cannot be enforced consistent with the Bankruptcy Code.

"The Bankruptcy Code generally prohibits enforcement of *ipso facto* clauses—contract clauses that modify or terminate an executory contract due to a debtor's filing of a bankruptcy petition." *In re Lehman Bros. Holdings Inc.*, 970 F.3d 91, 98 (2d Cir. 2020) (per curiam). One provision giving effect to this prohibition is 11 U.S.C. § 541(c)(1).

That subsection provides that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement . . . that is conditioned on the insolvency or financial condition of the debtor" or the commencement of a bankruptcy proceeding, and "that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property." 11 U.S.C. § 541(c)(1).

Daileader argues that the Bankruptcy/Insolvency Exclusion is an *ipso facto* clause preempted by § 541(c)(1). Among those "Claims" against the insured for which the Exclusion eliminates coverage are those "involving" a "[w]rongful [a]ct" "alleged to have caused" Oaktree's "bankruptcy or insolvency." App'x 54. In Daileader's view, both the Syndicate 1861 policy and the proceeds therefrom are "property of the [Oaktree bankruptcy] estate." 11 U.S.C. § 541(c)(1). If that is so, then the estate's property interest cannot be "forfeit[ed], modifi[ed], or terminat[ed]" by the Exclusion. *Id.* Syndicate 1861 concedes that the Oaktree estate holds a property interest in the policies themselves. Appellees' Br. 55. But it contends that the *proceeds* of those policies are not property of the estate. If the Syndicate is correct on this point, then § 541(c)(1) does not prohibit the Exclusion's enforcement.

The parties do not direct us to any decisions of this court bearing precisely upon whether or when a bankruptcy estate holds a property interest in the proceeds of a D&O policy, for purposes of an analysis under 11 U.S.C. § 541(c)(1). Nor have we identified any ourselves.

We think it most significant that, when we heard this appeal, the Oaktree estate's claim to the D&O policy proceeds depended upon highly uncertain conditions precedent. *Cf. In re Adelphia*

*Commc'ns Corp.*, 298 B.R. 49, 53 (S.D.N.Y. 2003) ("Claiming the debtors now have a property interest in [D&O policy] proceeds . . . . would be akin to a car owner with collision coverage claiming he has the right to proceeds from his policy simply because there is a prospective possibility that his car will collide with another tomorrow. . . ."). It was conceivable that Oaktree's estate might have a property interest in the policy proceeds for the purpose of satisfying a settlement or judgment against Daileader resulting from the adversary proceedings. But there had been no such monetary resolution in those proceedings, and Daileader's liability had not been established. The estate's potential claims, if any, did not create a property interest in the proceeds.

Similar considerations apply to the "Rauch Action," a suit filed against an Oaktree entity by a former Oaktree employee. Landmark has accepted its duty to defend in that case, *see* App'x 1113–19, as it did in these adversary proceedings. But Syndicate 1861 has not yet done so. Nor has it needed to do so, because, to our knowledge, Landmark's policy has not yet been exhausted in the Rauch Action, which was stayed pending Oaktree's bankruptcy proceedings. *See* Appellant's Br. 55 – 56. Here, too, the Oaktree estate's interest in the policy proceeds remained speculative.

We conclude that Daileader did not clearly show that the proceeds of Syndicate 1861's policy had become "property of the [Oaktree] estate." 11 U.S.C. § 541(c)(1). The Bankruptcy/Insolvency Exclusion therefore properly remained in effect following Daileader's preliminary-injunction motion.

Matters may be different as this case proceeds. After oral argument before this court, Daileader's counsel informed us that Daileader and the Trustee had entered into a settlement agreement

that fully resolved all issues in the adversary proceedings, and which had been approved by the Bankruptcy Court for the District of South Carolina. We express no view as to whether that agreement has accorded the Oaktree estate a property interest in the proceeds of Syndicate 1861's policy. We entrust consideration of that question, insofar as it remains disputed, to the district court.

## CONCLUSION

We find no error, much less abuse of discretion, in the district court's denial of Daileader's motion for a preliminary injunction. Accordingly, we AFFIRM the district court's order.