*Reyes v. City of New York*

# In the
# United States Court of Appeals
# for the Second Circuit

———————

AUGUST TERM 2024

No. 23-7640

SEANPAUL REYES,
*Plaintiff-Appellee,*

v.

CITY OF NEW YORK,
*Defendant-Appellant,*

———————

On Appeal from the United States District Court
for the Southern District of New York

———————

ARGUED: NOVEMBER 13, 2024
DECIDED: JUNE 18, 2025

———————

Before: KEARSE, RAGGI, and KAHN, *Circuit Judges.*

———————

Defendant City of New York ("City") appeals from an order of the United States District Court for the Southern District of New York (Clarke, *J.*) preliminarily enjoining its enforcement against plaintiff SeanPaul Reyes of that part of a City Police Department policy forbidding video recording in police facilities under pain of arrest. The City submits that the district court erred when, after finding it unlikely that Reyes would succeed on his federal claim that the

policy violates the First Amendment to the United States Constitution, it nevertheless exercised supplemental jurisdiction to grant Reyes a preliminary injunction based on the likelihood of his succeeding on state and local law challenges to the policy. In any event, the City argues that Reyes failed to show a likelihood of success on the merits of his state and local law claims, irreparable harm, or the public interest weighing in his favor, all of which are necessary to support a preliminary injunction.

We identify no abuse of discretion in the district court's exercise of supplemental jurisdiction or in its determination of irreparable harm. But whether the district court erred in concluding that Reyes is likely to succeed on the merits or that the public interest weighs in his favor depends on a construction of state and local law, specifically, whether one or both of the laws at issue afford a right to record police activity inside police stationhouses. *See* N.Y. Civ. Rights L. § 79-p; N.Y.C. Admin. Code § 14-189. Because the laws do not speak clearly to that question, New York courts have not yet construed these laws, and any construction will significantly affect the state's important interests in the conduct of law enforcement activities, we do not now attempt to answer it ourselves. Rather, we certify the following question to the New York Court of Appeals:

> Does either N.Y. Civ. Rights Law § 79-p or N.Y.C. Admin. Code § 14-189 afford individuals such as plaintiff Reyes the right to video record law enforcement activities inside public facilities—specifically, inside the publicly accessible lobbies of police stationhouses—notwithstanding a New York City Police Department policy forbidding any video recording inside its facilities?

QUESTION CERTIFIED AND DECISION RESERVED.

————————

2

CHASE H. MECHANICK (Richard Dearing, Claude S. Platton, *on the brief*) *for* Sylvia O. Hinds-Radix, Corporation Counsel of the City of New York, *and* Muriel Good-Trufant, succeeding Acting Corporation Counsel of the City of New York, New York, NY, *for Defendant-Appellant*.

ANDREW CASE (Meena Roldán Oberdick, *on the brief*), LatinoJustice PRLDEF, New York, NY, *for Plaintiff-Appellee*.

Philip Desgranges, Shona Hemmady, The Legal Aid Society, New York, NY, *for Amicus Curiae* The Legal Aid Society, *in support of Plaintiff-Appellee*.

––––––––––––––––––

REENA RAGGI, *Circuit Judge*:

Plaintiff SeanPaul Reyes, who regularly posts his interactions with the police on YouTube, sued defendant City of New York ("City") in the United States District Court for the Southern District of New York (Jessica G. L. Clarke, *Judge*) to challenge that part of a City Police Department ("NYPD") policy forbidding video recording inside police facilities ("Anti-Recording Policy" or "Policy"). Reyes, who has twice been arrested for engaging in such proscribed recording, asserts that the Policy violates rights protected by (1) the First Amendment, *see* U.S. Const. amends. I, XIV; and (2) the New York State and New York City Right to Record Acts ("RTRAs"), *see* N.Y. Civ. Rights Law § 79-p(2); N.Y.C. Admin. Code § 14-189(b),[1] particularly insofar

---

[1] The State enacting legislation refers to the state law as the "New Yorker's right to monitor act," 2020 N.Y. Sess. Laws Ch. 100, S. 3253-A, and the City's enacting legislation describes the local law as one "[t]o amend the administrative code of

3

as the Policy prevents him from recording inside the publicly accessible areas of police facilities, such as stationhouse lobbies. He further contends that the Policy is null and void because it established a "rule" without undergoing the rulemaking process required by the Citywide Administrative Procedure Act ("CAPA"). *See* N.Y. City Charter § 1043.

The City here appeals from a November 2, 2023 district court order preliminarily enjoining enforcement of the challenged Policy and requiring the removal of any posted signs stating the Policy. *See Reyes v. City of New York*, No. 23-CV-6369 (JGLC), 2023 WL 7212192 (S.D.N.Y. Nov. 2, 2023). The City argues that the district court erred in (1) exercising supplemental jurisdiction to enter the challenged injunction based on Reyes's State and City RTRA claims after finding that he was not entitled to such preliminary relief on his First Amendment claim; and (2) finding Reyes to have satisfied the requirements for a preliminary injunction, *i.e.*, a likelihood of success on his RTRA claims, irreparable harm absent an injunction, and the public interest favoring an injunction.

For the reasons stated herein, we identify no abuse of discretion in the district court's exercise of supplemental jurisdiction. Nor do we identify error in its finding that Reyes satisfied the irreparable harm requirement for a preliminary injunction. Whether the district court erred in finding Reyes to have satisfied the other two requirements for such equitable relief, however, depends on whether it correctly construed the RTRAs to apply inside the publicly accessible lobbies of police stationhouses. This court

---

the city of New York, in relation to the right to record police activities," N.Y. City Local Law No. 67 (2020). For convenience, like the parties, we refer in this opinion to both laws as the "Right to Record Acts," or "RTRAs."

4

cannot confidently answer that question because the statutory texts, even when considered together with their contexts and legislative histories, do not clearly address it; New York courts have not yet construed the RTRAs; and any answer—affirmative or negative—could significantly affect important state interests, here the conduct of law enforcement in New York State and City. We, therefore, defer our own resolution of this appeal in order to certify the following determinative question to the New York Court of Appeals:

> Does either N.Y. Civ. Rights Law § 79-p or N.Y.C. Admin. Code § 14-189 afford individuals such as plaintiff Reyes the right to video record law enforcement activities inside public facilities—specifically, inside the publicly accessible lobbies of police stationhouses—notwithstanding a New York City Police Department policy forbidding any video recording inside its facilities?

## BACKGROUND[2]

### I.    The NYPD's Anti-Recording Policy and the State and City RTRAs

The challenged Anti-Recording Policy dates to June 2018 when the NYPD issued Procedure No. 203-29 in its Patrol Guide. That Procedure, titled "When a Member of the Service Encounters an Individual Observing, Photographing, and/or Recording Police Activity," instructs officers that individuals, in fact, "have *a right to* lawfully observe and/or *record* police activity including, but not limited to detentions, searches, arrests or uses of force." App'x 46 (emphases added). Consistent with that "right to . . . record," the Procedure enumerates guidelines telling officers "DO NOT,"

---

[2] The following facts are drawn from the record developed at the preliminary injunction hearing and are undisputed.

*e.g.,* discourage recording, obstruct cameras, or delete pictures from an observer's recording device. *Id.* (emphasis in original). At the same time, however, the Procedure states that the right to record does not obtain wherever police activity occurs. Rather, it "extends to individuals in public places, such as streets, sidewalks, and parks, as well as private property in which the individual has a legal right to be present." *Id.* In the particular provision challenged in this case—the Anti-Recording Policy—the Procedure explicitly states that there is no right to record within NYPD facilities and provides a three-step process for dealing with persons who insist on doing so:

> Members of the public are not allowed to photograph and/or record police activity within Department facilities. Members of the service may order any member of the public who is photographing or recording within Department facilities to stop such activity. If such person refuses to stop, they then should be ordered to leave the premises. If such person refuses to leave the premises, members of the service may take proper enforcement action under the trespass statutes (i.e., Penal Law Sections 140.05 and 140.10).

*Id.* at 47.[3]

Some two years after issuance of Procedure No. 203-29, New York State on July 14, 2020, and New York City on August 14, 2020, enacted their respective RTRAs.

---

[3] The quoted paragraph is repeated in the NYPD's June 10, 2021 updated Procedure No. 304-21, also titled "When a Member of the Service Encounters an Individual Observing, Photographing, and/or Recording Police Activity." Thus, herein "Anti-Recording Policy" references the Policy both as promulgated in Procedure No. 203-29 and as now in effect.

The State RTRA states as follows:

> Right to record law enforcement related activities. A person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity and to maintain custody and control of that recording and of any property or instruments used by that person to record law enforcement activities, provided, however, that a person in custody or under arrest does not, by that status alone, forfeit the right to have any such recordings, property and equipment maintained and returned to him or her. Nothing in this subdivision shall be construed to permit a person to engage in actions that physically interfere with law enforcement activity or otherwise constitute a crime defined in the penal law involving obstructing governmental administration.

N.Y. Civ. Rights Law § 79-p(2). The City RTRA similarly states:

> Right to record police activities. A person may record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording. Nothing in this chapter shall be construed to permit a person to engage in actions that physically interfere with an official and lawful police function, or to prevent the seizure of any property or instruments used in a recording of police activities where the seizure is otherwise authorized by law, or to prohibit any officer from enforcing any other provision of law.

N.Y.C. Admin. Code § 14-189(b). Both laws afford a private right of action. *See* N.Y. Civ. Rights Law § 79-p(3); N.Y.C. Admin. Code § 14-189(c).[4]

---

[4] Given the statutes' similar wording and structure, the parties have not argued that Reyes's claims should be analyzed any differently under one RTRA or the

In response to these laws, in July 2020, the NYPD Legal Bureau issued a "Bulletin" to provide officers with "guidance" on "the rights of individuals to record and/or criticize police action" as now "codified into state and local law." App'x 70–71 & nn. 3–4 (citing RTRAs). That guidance lists situations in which "police officers may **NOT** order an observer" to stop recording, arrest him for doing so, or seize recording equipment. *Id.* at 71 (emphasis in original). It also emphasizes that "**UNDER NO CIRCUMSTANCES**" may an officer take a list of specified actions to prevent, discourage, penalize, or destroy the recording of police activities. *Id.* (emphasis in original).

The bulletin instructs that the newly codified right to record is "not absolute" in that it does not permit "actual interference with a police officer's investigation." *Id.* at 72 (explaining that for conduct "to reach the requisite level of interference, there must be some additional activity (other than video recording or criticism) that leads to *actual* interference with the performance of an official police function" (emphasis in original)). The bulletin advises that the new RTRAs "do not change the [NYPD's] prohibition on recording inside its facilities" as reflected in the NYPD Patrol Guide. *Id.* at 73. As pertinent here, the bulletin explains:

### 1. Department Facilities

Police stationhouses are a public place for purposes of public access. Courts, however, have held that where municipal property is generally held open to the public, the privilege to

other, and accordingly, we have not undertaken an independent inquiry into whether one law is broader than the other. Although we treat them similarly for purposes of this opinion, the New York Court of Appeals may, of course, decide to analyze them independently, should it accept the question certified herein.

enter and use the space may be regulated to prevent interference with the property's ordinary use. Due to the sensitive nature of what occurs inside police stationhouses, law enforcement agencies can limit expressive activities within the confines of a stationhouse in order to uphold the sanctity of investigations, protect witnesses, and allow officers to perform essential functions without interference. Patrol Guide Section 203-29(7) prohibits recording inside Department facilities.

When an individual is observed recording inside a Department facility, such as a precinct stationhouse, in any manner, an officer should immediately order the person to stop recording. If the person refuses to stop recording, the officer should order the person to leave the premises. If the person does not stop recording and does not leave the premises, enforcement for trespass is appropriate.

The new laws do not change the Department's prohibition on recording inside its facilities. A claim of unlawful interference for recording law enforcement activity is not valid when such recording is not authorized by law. Where a person enters a Department facility to record activities in the facility, the person is not there to obtain police services — and their conduct impacts the officers' ability to perform such services as well as the ability for other members of the public to obtain them. Thus, the recording and continued presence of the person in the Department facility is not lawful, and warrants proper trespass enforcement.

*Id.* (footnotes omitted).

## II.     Reyes's Recording of Police Activities and Arrests

Reyes, a resident of Suffolk County, New York, describes himself as an "independent journalist" who records his encounters with public officials performing official duties "to educate others on what to expect from such encounters and as an expression of his First Amendment rights." *Id*. at

15. Reyes alleges that some of his encounters are prompted by "tips" he receives about official misconduct. *Id.* at 116. Reyes edits and then posts his recordings on his YouTube channel, "Long Island Audit," which has more than a half-million subscribers. *Id.* at 15. He also posts recordings on platforms such as Facebook, Instagram, and TikTok, resulting in what he estimates as a total of more than 20 million views per month.

On or about April 3, 2023,[5] Reyes went to the NYPD's 61st Precinct stationhouse in Brooklyn, having received a "tip" that police were "arresting people for recording in the lobby." *Id.* at 63, 119. After Reyes himself began video recording,[6] two NYPD officers approached him and, referencing the Anti-Recording Policy, repeatedly told him either to stop filming or to leave the stationhouse. They also pointed out a wall sign stating that, under the Policy, "[m]embers of the public are prohibited from audio/video recording or photography inside this facility." App'x 84. When Reyes refused to stop recording or to leave the stationhouse, the officers repeated their instructions and warned that if Reyes did not heed them, he would be arrested, which is what ultimately happened. Reyes was held at the stationhouse for approximately six hours before being released with a Desk Appearance Ticket charging him with trespass in violation of N.Y. Penal Law § 140.05. Subsequently, the district attorney's office declined prosecution and the charge was dismissed.

---

[5] There is some record discrepancy as to the exact date.

[6] Reyes's video recording of the incident is available on his YouTube channel: https://perma.cc/5PF3-P6EM.

Two months later, on June 1, 2023, Reyes attempted to record inside the lobby of the NYPD's 75th Precinct stationhouse in Brooklyn, and was again arrested.[7]

## III.    Procedural History

On July 24, 2023, Reyes initiated this action, invoking federal question and supplemental jurisdiction to claim that the Anti-Recording Policy violates his rights under the First Amendment of the United States Constitution and the State and City RTRAs. *See* 28 U.S.C. §§ 1331, 1367. The following day, Reyes moved for a preliminary injunction (1) prohibiting the City from enforcing the challenged Anti-Recording Policy, and (2) requiring it to remove any signs in NYPD stationhouses detailing the Policy. After conducting an evidentiary hearing at which it heard testimony from both Reyes and NYPD Captain Joseph Leone, the district court granted Reyes's motion, finding that, although he did not satisfy the likelihood-of-success requirement for a preliminary injunction on his First Amendment claim, he did satisfy that and all other injunction requirements with respect to his State and City RTRA claims. *See Reyes v. City of New York*, 2023 WL 7212192, at *4–13.[8]

---

[7] The charges against Reyes for trespass, N.Y. Penal Law § 140.05, third-degree criminal trespass, *id.* § 140.10(A), and obstructing governmental administration, *id.* § 195.05, were subsequently dismissed. *See* Decision and Order at 6, *People v. Reyes*, CR-019322-23KN (N.Y. Crim. Ct. Jan. 30, 2023). Reyes alleges that the June 1, 2023 arrest confirms that he is at risk of rearrest should he again "choose to exercise his rights" to record inside police stationhouses. App'x 29.

[8] The district court deemed it unnecessary then to consider Reyes's CAPA claim. *Id.* at *11. Its subsequent dismissal of that claim, *see Reyes v. City of New York*, No.

11

As to the former, the district court concluded that Reyes was not likely to succeed on the merits of his First Amendment claim because NYPD stationhouse lobbies are limited public fora, where restrictions "on the form or manner of speech need only be . . . viewpoint-neutral and reasonable in relation to the forum's purpose." *Id.* at *8 (internal quotation marks omitted). The district court concluded that the challenged Policy appeared to be not only viewpoint-neutral but also reasonable in light of the City's uncontradicted justifications related to the "privacy, safety and security" of people who visit stationhouse lobbies, including potential informants and crime victims. *Id.* at *9–10.[9]

---

23-CV-6369 (JGLC), 2024 WL 4354877, at *4 (S.D.N.Y. Sept. 30, 2024), is not at issue on this appeal.

Reyes, nevertheless, argues that this court can affirm the challenged injunction based on the City's failure to follow CAPA rulemaking procedures in promulgating the challenged Policy. We decline to do so given that (1) the district court did not rule on that ground, *see Melendez v. City of New York*, 16 F.4th 992, 1046 (2d Cir. 2021) (declining to consider argument "advanced in plaintiffs' motion for preliminary injuncti[on]," on which "district court did not rule"); (2) Reyes did not appeal the preliminary injunction order on that basis; and (3) in a letter to this court Reyes stated that, because "no preliminary injunction had been issued pursuant to the CAPA claim," the ruling "has no bearing on the instant appeal," Appellee Ltr., Oct. 21, 2024.

[9] Significantly, the district court did not then dismiss Reyes's First Amendment claim. In fact, the following year, it expressly denied dismissal of that federal claim, departing from the forum analysis it had applied at the preliminary injunction stage and identifying "intermediate scrutiny" as the appropriate First Amendment test, *i.e.*, was the challenged Policy (1) a "reasonable time, place, and manner" restriction, and (2) "content-neutral, narrowly tailored," and one allowing "alternative channels for speech." *Reyes v. City of New York*, 2024 WL 4354877, at *4–7 (internal quotation marks omitted). The district court concluded

12

As to the RTRA claims, however, the district court concluded that Reyes had demonstrated a likelihood of success on the merits because these laws "mean what they say: people can record the police," and provide no "carve out" for police stationhouses. *Id.* at *11.

The City timely appealed and moved for a stay of the injunction pending appeal, which a panel of this court granted "to the extent it applies to members of the public other than [Reyes] and to the extent it requires police department signs to be removed or altered." *Reyes v. City of New York*, 23-7640 (2d Cir. Mar. 15, 2024) (Motion Order). Reyes now urges this court to uphold the challenged injunction "as modified," *i.e.*, as applied only to him. Appellee Br. at 63.

## DISCUSSION

### I.  Standard of Review

We review both a district court's grant of a preliminary injunction and its exercise of supplemental jurisdiction over pendent state law claims for abuse of discretion. *See Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 135 (2d Cir. 2023); *Carver v. Nassau Cnty. Interim Fin. Auth.*, 730 F.3d 150, 154 (2d Cir. 2013), *as corrected* (Sept. 27, 2013). This encompasses deferential clear error review for factual findings, and *de novo* review of legal conclusions, including the district court's interpretation of state laws such as the RTRAs here at issue. *See Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88

_____

that the case had to proceed to discovery to determine if the Anti-Recording Policy was "narrowly tailored" to serve the government's "legitimate state interests." *Id.* at *7. Neither the denial of a preliminary injunction on Reyes's First Amendment claim, nor the correct standard of review for that constitutional claim is before us on this appeal.

13

F.4th at 135; *McGrath v. Toys "R" Us, Inc.*, 356 F.3d 246, 249 (2d Cir.), *certified question answered*, 3 N.Y.3d 421 (2004).

## II.    Supplemental Jurisdiction

The City argues that the district court erred when, after concluding that Reyes was not entitled to injunctive relief on his First Amendment claim, it nevertheless exercised supplemental jurisdiction to grant him a preliminary injunction based on his State and City RTRA claims.   We identify no error in the exercise of jurisdiction.

Congress has afforded district courts "supplemental jurisdiction over all other claims that are so related to claims in [an] action within [their] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."   28 U.S.C. § 1367(a). There is no question here that Reyes's State and City RTRA claims and his First Amendment claim, both challenging the same Anti-Recording Policy, "are so related . . . that they form part of the same case or controversy." *Id.*

Congress does not, however, compel the exercise of supplemental jurisdiction over all such related claims.

> [D]istrict courts *may* decline to exercise supplemental jurisdiction over a claim under subsection (a) if—(1) the claim raises a novel or complex issue of State law,[10] (2) the claim

[10] As the statutory text makes plain, the first circumstance operates in the disjunctive, *i.e.,* a court "may decline to exercise supplemental jurisdiction" over a claim that "raises a novel *or* complex issue of State law." 28 U.S.C. § 1367(c) (emphasis added).   Insofar as the district court cast this language in the conjunctive, *see Reyes v. City of New* York, 2023 WL 7212192, at *10 ("Courts in this circuit have generally declined to exercise supplemental jurisdiction . . . [when]

14

substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in [other] exceptional circumstances.

*Id.* § 1367(c) (emphasis added). As the highlighted word "may" indicates, the presence of one of the statute's enumerated factors "does not mean that dismissal [of related state or local claims] is mandated." *See Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 439 (2d Cir. 2011). Rather, upon identification of such a factor, "the district court may then undertake the discretionary inquiry of whether to exercise supplemental jurisdiction." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 85 (2d Cir. 2018). We have advised district courts that, when doing so, they should generally retain jurisdiction of state claims related to pending federal ones unless it "would not promote the values . . . [of judicial] economy, convenience, fairness, and comity." *Id.* (internal quotation marks omitted); *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

The City argues that once the district court determined that Reyes was not entitled to a preliminary injunction based on his First Amendment claim, it should have declined to exercise supplemental jurisdiction over his RTRA claims because they present "novel" questions of state law. 28 U.S.C. § 1367(c)(1). To the extent no New York court has yet interpreted either the State or City RTRA, much less done so as applied to the NYPD's Anti-Recording Policy, the City correctly identifies this case as presenting novel

---

the state law claim was both novel *and* complex." (emphasis in original)), we do not understand it to have been pronouncing any higher standard for declining jurisdiction, but only to have been identifying circumstances when courts have most frequently exercised their discretion not to exercise supplemental jurisdiction.

15

questions of state law. That conclusion, however, did not compel the district court to decline supplemental jurisdiction. Such a declination decision is properly informed by the above-referenced *Gibbs* factors.

The first *Gibbs* factor, judicial economy, does not weigh in favor of declining supplemental jurisdiction over Reyes's RTRA claims. This is not the "usual case in which all federal-law claims are eliminated before trial." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d at 85 (internal quotation marks omitted). Rather, Reyes's First Amendment challenge remains pending in the district court and would proceed even if the district court declined supplemental jurisdiction over Reyes's RTRA claims. *See Reyes v. City of New York*, 2024 WL 4354877, at *7. The dismissal of the RTRA claims and their refiling in state court while Reyes's First Amendment claim remains pending in this action would thus unnecessarily draw on the resources of two tribunals (rather than one) to resolve federal, state, and local challenges to the Anti-Recording Policy arising out of identical factual circumstances.

As for fairness, it is not apparent how that would be enhanced by requiring the parties simultaneously to litigate before a state and federal court. Meanwhile, more inconvenience than convenience could result from requiring duplicative factual presentations in two tribunals.

A closer question is presented by comity, the fourth *Gibbs* factor. In *Carver v. Nassau Cnty. Interim Fin. Auth.*, we cited comity in concluding that the district court exceeded its discretion in exercising supplemental jurisdiction over state claims. 730 F.3d at 150. The City cites *Carver* to urge the same conclusion here, but that case is not analogous to this one.

The defendant in *Carver*, the Nassau Interim Finance Authority ("NIFA"), was "a public benefit corporation created by the New York State Legislature in June 2000" to address a "growing financial crisis facing Nassau County." *Id.* at 152. When, in 2011, NIFA ordered a wage freeze for county employees at odds with certain collective bargaining agreements, police unions sued, alleging both (1) that the freeze violated the Contracts Clause, U.S. Const., art. I, § 10, cl. 1, and (2) that NIFA "lacked the authority under state law to order a wage freeze," *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d at 153. On the parties' cross-motions, the district court entered summary judgment in favor of the unions, ruling that NIFA had exceeded its authority under state law without addressing the Contracts Clause claim. *See id.* This court reversed, holding that the district court abused its discretion in exercising supplemental jurisdiction, and remanded for dismissal of the state law claim. *Id.* at 154–56. In so ruling, we observed that comity there required that a state court be permitted to construe and apply "a significant provision of an extraordinarily consequential legislative scheme [designed] to rescue Nassau County from the brink of bankruptcy." *Id.* at 154.

This case is distinguishable in at least two important respects. First, the entry of the preliminary injunction (as modified by this court) was not an equivalent "decision[] of state law," let alone a needless one. *United Mine Workers of Am. v. Gibbs*, 383 U.S. at 726. The district court's adjudication of state law in *Carver* resulted in the entry of a final judgment, which closed the case without any consideration of the federal claim. *See Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d at 156 (vacating judgment). By contrast, the district court here entered no final judgment conclusively deciding Reyes's RTRA claims. Rather, it granted only a preliminary injunction based on

17

these state claims pending further litigation on their merits along with the merits of the federal claim to which they relate. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 192 (2d Cir. 2012) (stating that preliminary injunction "is not a final judgment of the court on the merits" (internal quotation marks omitted)); *see also Pugh v. Goord*, 345 F.3d 121, 125 (2d Cir. 2003) ("Preliminary injunction motion papers should not be treated as if they were a response to a motion for summary judgment, because parties are not required to present everything they have when moving for a preliminary injunction." (internal quotation marks omitted) (alteration adopted)). Thus, in this case, by contrast to *Carver*, the effect of the appealed preliminary injunction on the City is necessarily only provisional and contemplates further litigation as to both Reyes's state and federal claims.

Second, while Reyes's RTRA challenges to the Anti-Recording Policy, like the unions' challenge to the NIFA freeze orders in *Carver*, "concern the state's interest in the administration of its government," the RTRAs are not aimed at preventing the "demise" of a county, municipality, or municipal department. *Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d at 155–56. In short, the impact of the challenged injunction on state interests, while certainly important, is not existential.

Moreover, as this court has recognized, there is available to this court—though not to the district court—"an alternate method for resolving" the novel issues of state law raised by Reyes's RTRA challenges to the Anti-Recording Policy, *i.e.*, certification. *See Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d at 439; *see also infra* at 36–37 (discussing rules and standards for certification). To be sure, in *Oneida*, this court decided that dismissal of state claims was preferable to certification. But that conclusion was informed by the fact that in *Oneida* "almost all of the . . . federal claims—

18

with just one narrow exception—" had been dismissed and "there [were] already pending state-court proceedings" in which the state law issues had been raised. *Id.* at 439 & n.26. No such circumstances are present in this case. Thus, we conclude that, to the extent Reyes's RTRA challenges to the Anti-Recording Policy present novel questions of state law implicating the state's interest in the administration of its justice system, comity can here be satisfied by certification and does not demand dismissal of these state and local claims.

Accordingly, we identify no abuse of discretion in the district court's exercise of supplemental jurisdiction to grant the challenged preliminary injunction, and we decline to vacate the injunction on that ground. Instead, we await the New York Court of Appeals's response to our certified question, which will allow us to review the challenged injunction on the merits.[11]

## III.    The Preliminary Injunction

The City argues that even absent jurisdictional error, the district court abused its discretion in entering the challenged preliminary injunction because, notwithstanding the district court's findings, Reyes did not demonstrate that (1) he is likely to succeed on the merits of his RTRA claims, (2) he would likely sustain irreparable harm absent injunctive relief, and (3) the public interest weighs in favor of injunctive relief. *See Agudath Israel*

---

[11] We express no view as to whether the exercise of supplemental jurisdiction over Reyes's RTRA claims will be warranted at later stages of this litigation. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (directing courts to consider propriety of supplemental jurisdiction "at every stage of the litigation").

*of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).[12]  The City's irreparable harm argument is meritless.  The other two arguments, however, depend on how New York's highest court would construe the RTRAs.  Because we cannot predict how it would do so, we defer our resolution of this appeal in order to certify that determinative question to the New York Court of Appeals.

### A. Irreparable Harm

A party seeking a preliminary injunction must demonstrate that absent such relief it "will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023).  If Reyes had failed to carry this burden, this court could vacate the challenged preliminary injunction on that ground without needing to construe the scope of the RTRAs supporting the injunction.  The district court did not err, however, in concluding that Reyes satisfied the irreparable harm requirement.

---

[12] This standard applies to so-called "prohibitory" preliminary injunctions, which "maintain the status quo pending resolution of the case."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 36–37 (2d Cir. 2018).  "Mandatory" preliminary injunctions, which "alter" the status quo, usually by mandating some affirmative act, are subject to a "heightened legal standard," *id.*, requiring "plaintiff [to] show a *clear or substantial* likelihood of success on the merits and [to] make a *strong showing* of irreparable harm," *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (emphasis in original) (internal quotation marks omitted).  On this appeal, the City does not contend that the challenged injunction is mandatory, but only that Reyes failed to satisfy the standard for a prohibitory preliminary injunction.  We, thus, need not consider whether the heightened standard is satisfied in this case.

The district court reached this conclusion because it found the challenged Policy had "already caused [Reyes] to forgo recording in police precinct lobbies," and "[w]ithout an injunction, [he] faces a choice between filming the police . . . or being arrested." *Reyes v. City of New York*, 2023 WL 7212192, at *12. In arguing error, the City submits that the district court "relied *exclusively* on a presumption of irreparable injury arising from constitutional violations," which was unwarranted after the district court concluded that Reyes was unlikely to succeed on the merits of his First Amendment claim. Appellant Br. at 31 (emphasis in original). The City argues that its Policy preventing Reyes from filming inside police stationhouses amounts to a mere "personal inconvenience," and that any loss in government "transparency" resulting from Reyes's inability to record does not cause him irreparable harm. *Id.* at 32–35 (internal quotation marks omitted and alteration adopted). We are not persuaded.

The Supreme Court has recognized that "being required to forego constitutionally protected activity in order to avoid arrest" can constitute irreparable injury. *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1160 (2d Cir. 1974) (collecting cases); *see Vincenty v. Bloomberg*, 476 F.3d 74, 89 (2d Cir. 2007) (holding irreparable harm conclusion not erroneous where plaintiff had "refrained from their artistic expression because they feared prosecution"). We think the same conclusion obtains here, where, Reyes claims that the challenged Policy requires him to forego statutorily protected rights of expression in order to avoid arrest. *See generally* N.Y. Assembly Debate on Senate–Assembly Bill S3253-A, A1360-A (June 8, 2020) at 118 (Statement of Assemblymember Perry) ("We're putting [the right to record police activities] in the law of New York State, so that if the police transgress[] on that right, you have a cause of action to seek redress as a free

21

citizen with the right to freedom of expression, and one of your free expressions is the one to monitor misbehavior by your police department."). That conclusion applies whether the legislatures intended to codify a right of expression coextensive with the First Amendment or to afford a broader right. In either circumstance, Reyes here plainly stands "between the Scylla of intentionally flouting [the Anti-Recording Policy] and the Charybdis of foregoing what he believes to be . . . protected [expressive] activity in order to avoid becoming enmeshed in a criminal proceeding," a circumstance that this court has recognized presents a real and imminent risk of irreparable harm. *414 Theater Corp. v. Murphy*, 499 F.2d at 1160 (internal quotation marks omitted).

If Reyes chooses the first option, he loses his liberty. That is no speculative possibility; the City has already enforced the challenged Policy by twice arresting Reyes for filming inside police stationhouse lobbies, and it has not disavowed an intent to rearrest him he does so again. *See Vincenty v. Bloomberg*, 476 F.3d at 89 (affirming "finding of likely irreparable harm . . . based in part on the record evidence that the City intends to enforce [challenged law]"). If he chooses the second option, his ability to document police activity occurring at a particular time and place is forever lost. Each video Reyes might record is "a unique product," the monetary value of which is impossible retroactively to quantify. *Cf. Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–08 (2d Cir. 1990) ("Each picture tells a story and carries a reminder of the truth contained in the old adage that weighs one picture against a thousand words."). Thus, foregoing video recording to avoid arrest deprives Reyes not only of the "personal convenience" of being able later to review what he has witnessed, but also of the ability to share the recording with the public, which is thus denied the ability to scrutinize

22

police activity that might otherwise have been documented. Such a loss of the ability timely to communicate with others on matters of public concern—whether constitutionally or statutorily protected—is not compensable with money damages. *Cf. Elrod v. Burns*, 427 U.S. 347, 373–74 & n.29 (1976) (holding "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," and recognizing "timeliness of political speech [as] particularly important" in view of "right to a free discussion of public events and public measures, and to enable every citizen at any time to bring the government and any person in authority to the bar of public opinion by any just criticism upon their conduct in the exercise of the[ir] authority" (internal quotation marks omitted)).

In sum, the challenged injunction is not based on a "presumption" of irreparable harm, as the City argues. It is based on actual, imminent, and irretrievable loss either of liberty or of the ability to record police activities for public scrutiny. Thus, the district court did not err in concluding that Reyes satisfactorily demonstrated irreparable harm.

## B. Likelihood of Success on the Merits

Whether the district court erred in finding Reyes likely to succeed on the merits of his RTRA claims depends on how broadly one construes the right to record afforded by those state and local laws, specifically, whether the right obtains inside the publicly accessible lobbies of police stationhouses.

To answer that question, a federal court looks first to whether the state's highest court—here, the New York Court of Appeals—has spoken to the point at issue in a controlling decision. *See Chufen Chen v. Dunkin'*

23

*Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020).  It has not.  Indeed, it appears that no New York court has yet construed the State or City RTRAs, much less construed either law to apply inside police stationhouses or to preclude enforcement of the Anti-Recording Policy therein.

In such circumstances, a federal court next properly considers whether state-law principles of statutory interpretation and related precedents permit it to "predict how the forum state's highest court would decide" the point at issue.  *Khan v. Yale Univ.*, 27 F.4th 805, 831 (2d Cir. 2022) (internal quotation marks omitted), *certified question answered*, 347 Conn. 1 (2023); *see also East Fork Funding LLC v. U.S. Bank, N.A.*, 118 F.4th 488, 503 (2d Cir. 2024) (Liman, *J.*, concurring) (reasoning federal courts should apply state, "and not federal, principles of statutory interpretation" when construing state law); Charles Alan Wright & Arthur R. Miller, 19 Fed. Prac. & Proc. § 4507 (3d ed. 2025) ("The *Erie* doctrine should require federal courts to use the forum state's interpretive method.").  When we do that here, we cannot confidently predict whether the New York Court of Appeals would construe the State and City RTRAs to apply inside police stationhouse lobbies so as to warrant enjoining enforcement of the Anti-Recording Policy therein.

The New York Court of Appeals has identified as the first rule of statutory construction that laws be construed "to effectuate the intent of the Legislature."  *People v. Iverson*, 37 N.Y.3d 98, 103 (2021) (internal quotation marks omitted); *see People v. Roberts*, 31 N.Y.3d 406, 418–19 (2018) (stating that court should "construe the act in question so as to suppress the evil and advance the remedy" identified by the legislature (internal quotation marks omitted)); *accord Article 13 LLC v. Ponce DeLeon Fed. Bank*, 132 F.4th 586, 593 (2d Cir. 2025) (stating that under New York principles of statutory

24

interpretation "primary consideration when interpreting a statute is legislative intent" (internal quotation marks omitted)). Toward that end, a court properly "look[s] first to the statutory text, which is the clearest indicator of legislative intent." *People v. Iverson*, 37 N.Y.3d at 103 (internal quotation marks omitted). In doing so, however, New York courts will also consider "context" and "legislative history." *Id.* (instructing that, "[i]n a manner consistent with the statutory text, [a court] interpreting a statute may also look to the purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history" (internal quotation marks omitted)). In particular, New York courts give "considerable weight in discerning legislative intent" to lawmakers' "contemporaneous interpretation[s] of a statute," especially those expressed in the "Governor's Bill Jacket" attached to all New York laws and the "sponsor's Memorandum" contained therein. *Knight-Ridder Broad., Inc. v. Greenberg*, 70 N.Y.2d 151, 158–59 (1987); *accord Brokamp v. James*, 66 F.4th 374, 398 n.22 (2d Cir. 2023) (observing that under New York law, "contemporaneous interpretation of a statute [in bill jacket] is entitled to considerable weight in discerning legislative intent" (quoting *Vatore v. Comm'r of Consumer Affs.*, 83 N.Y.2d 645, 651 (1994))), *cert. denied*, 144 S. Ct. 1095 (2024).

Here, the district court focused on statutory text in construing the RTRAs as "broad" and "straightforward" laws that "mean what they say: people can record the police" as long as the person does not physically interfere with law enforcement. *Reyes v. City of New York*, 2023 WL 7212192, at * 11. From this, it reasoned that Reyes was likely to succeed on his RTRA challenges to the Anti-Recording Policy because the Policy is an "outright

25

ban of all recording" in police stationhouses, and neither the State nor City RTRA "carve[s] out" a recording exception for police stationhouses. *Id.*

On *de novo* review, we agree that the RTRAs' texts clearly codify a "right to record law enforcement activity." *Supra* at 7 (quoting RTRAs). But what does that right entail, given potentially competing privacy and safety considerations? Does it apply anywhere and everywhere that law enforcement is taking place? Does it apply to anyone and everyone present during such activity? The RTRAs do not speak to that. They state only that the right does not permit a person "physically [to] interfere" with or otherwise to obstruct law enforcement activity. *Supra* at 7 (quoting RTRAs). Reyes argues that there is nothing ambiguous about this text and that the codified right to record in both RTRAs is, in any event, sufficiently broad to apply to the publicly accessible lobbies of police stationhouses, thereby prohibiting enforcement of the Anti-Recording Policy against him in such lobbies so long as he does not physically interfere with or obstruct any law enforcement activity.

In urging otherwise, the City submits that nothing in the statutory texts prohibits government entities "like the NYPD[] from establishing rules governing conduct within government facilities," consistent with general principles of property law. Appellant Br. at 3; *see generally Rogers v. N.Y.C. Transit Auth*, 89 N.Y.2d 692, 698 (1997) ("Government, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985))). Indeed, it submits that construing the statutory text so broadly as to preclude rules such as those reflected in the Anti-Recording Policy risks "absurd" results, insofar as it would allow persons to record law enforcement activities occurring in both

26

non-public and public areas of police stationhouses (as well as numerous other premises, including courthouses) and involving possibly vulnerable persons such as confidential informants, crime victims, and undercover officers. Appellant Br. at 39–40.

"Both sides of this argument score some points," but not enough to allow us "confidently [to] predict how the" New York Court of Appeals would interpret the RTRAs as applied to the facts of this case. *Loomis v. ACE Am. Ins. Co.*, 91 F.4th 565, 575 (2d Cir.), *certified question answered*, 244 N.E.3d 908 (Ind. 2024). If those laws are properly construed to codify a right to record law enforcement activity *wherever* it occurs and *whomever* it involves—subject only to the statutory caveat about physical interference with or obstruction of police activity—that would presumably supersede any common law property or privacy rights that the City or persons might claim to limit recording at odds with these enacted laws. *See Hechter v. New York Life Ins. Co.*, 46 N.Y.2d 34, 39 (1978) ("[I]t is a general rule of statutory construction that a clear and specific legislative intent . . . override[s] the common law."); *accord BL Doe 3 v. Female Acad. of the Sacred Heart*, 158 N.Y.S.3d 474, 479 (4th Dep't 2021); *see People v. Leonard,* 62 N.Y.2d 404, 410–11 (1984) (stating New York's common law of property allows government to eject persons from its premises based on failure to act in manner consistent with property's use but not based on participation in "constitutionally or . . . statutorily protected activity"). Further, if the legislatures clearly intended for the RTRAs to reach that broadly, the City could hardly maintain that affording persons a right to record in police stationhouses is "absurd," however much it might question the prudence of that legislative choice. *See People v. Graham*, 965 N.Y.S.2d 271, 272 (2d Dep't 2013) ("It is well settled that in construing a statute, a court should attempt

27

to effectuate the intent of the legislature and 'not sit in review of the discretion of the Legislature, or determine the expediency, wisdom or propriety of its action on matters within its powers.'" (citation omitted) (quoting *People v. Friedman*, 302 N.Y. 75, 79 (1950))).

On the other hand, if the RTRAs are properly construed more narrowly—*e.g.*, to afford a right to record law enforcement activities only when occurring on public streets or within publicly accessible premises, or subject to time, manner, and place limits consistent with those acceptable under the First Amendment, that could permit some enforcement of the challenged Anti-Recording Policy. Thus, insofar as Reyes argues that *People v. Leonard*, 62 N.Y.2d 404, resolves this appeal, we are not persuaded because the Anti-Recording Policy would not conflict with the RTRAs or *Leonard* if the laws are construed not to afford a right to record inside police stationhouses.[13]

In short, we cannot confidently discern from the RTRAs' statutory texts, contexts, or legislative histories how broadly or narrowly the enacting legislatures intended the codified right to record to apply. Thus, we cannot predict how the New York Court of Appeals would construe these statutes as applied to this case. A number of factors inform our hesitancy.

---

[13] Reyes argues that because, under *Leonard*, "[s]tate trespass laws may not be enforced . . . solely to exclude persons from exercising First Amendment or other protected conduct," the NYPD may not exclude him from police stationhouses solely for recording video therein (*i.e.*, exercising his statutory rights under the RTRAs). Appellee Br. at 47–51 (quoting *People v. Leonard*, 62 N.Y.2d at 410). But that argument presupposes that the RTRAs protect the right to film inside police stationhouses.

First, nothing in the RTRAs' texts or contexts indicate that the enacting legislatures considered the recording of law enforcement activities occurring inside any premises, government or private. Nor have we located any mention of such facilities in the laws' legislative histories. To the extent the histories permit us to identify any focus of legislative attention, it appears to have been the sort of police misconduct on public streets that resulted in the death of George Floyd, which was documented because a bystander was able to record it. *See*, *e.g.*, N.Y. Assembly Debate on Senate–Assembly Bill S3253-A, A1360-A (June 8, 2020) at 122 (Statement of Assemblymember Bichotte) ("We would not even be here . . . [unless] we were able to witness the murder of George Floyd."); *id.* at 120 (Statement of Assemblymember Perry) ("New Yorkers . . . have a right to monitor and record police arrests and other police activity occurring in public spaces *on our public streets.*" (emphasis added)); Council of City of N.Y. Pub. Safety Comm., Comm. Rep. of the Justice. Div. 4–5 (June 9, 2020) (discussing murder of George Floyd in connection with right to record police activity). But we can hardly reach that conclusion confidently.[14] Nevertheless, the absence of any legislative discussion of whether a right to record law enforcement activities obtains inside police premises as well as on the street

---

[14] It appears that the State RTRA was first proposed in 2016, and the City RTRA in 2018, some years before George Floyd's death, *see* N.Y. Senate Introducer's Mem. in Support, Bill Jacket, L. 2020, ch. 100 at 5; N.Y. City Council, Transcript of the Minutes of Stated Meeting, March 7, 2018, but only enacted in 2020, soon after his death.

is noteworthy because law enforcement activities routinely take place within a variety of private as well as governmental spaces.[15]

Also absent from the RTRAs' texts or histories are any references to the Anti-Recording Policy. In considering the scope of legislation intended to minimize police misconduct, that omission is noteworthy given that the NYPD is by far the largest law enforcement entity in New York State; its Anti-Recording Policy had been in effect for two years when the RTRAs were enacted; and the RTRAs would effectively invalidate that Policy if, in fact, they were intended to codify rights to record inside police stationhouses. In such circumstances, we hesitate ourselves to locate in legislative silence an intent to take such significant action. *See generally People v. Ocasio*, 28 N.Y.3d 178, 183 n.2 (2016) (observing that legislative silence and/or inaction "is inconclusive in determining legislative intent . . . [and] susceptible to varying interpretations" (internal quotation marks and citation omitted)).

Second, to the extent the RTRAs' legislative history provides any insights into how broadly the legislatures intended for a right to record to apply, the record is neither clear nor consistent. On the one hand, there is some suggestion that the legislatures' intent was not to confer any new right to record but, rather, to codify in state and local law a right that some federal

---

[15] Law enforcement activities can occur in almost any state, county, or municipal building, including city halls, public hospitals, public schools, penal institutions, courthouses, as well as police stationhouses. They can also occur within privately owned premises, including sports and entertainment venues, commercial establishments, non-profit facilities, apartment complexes, and even private homes. We locate nothing in the texts, contexts, or histories of the RTRAs that references such premises or indicates legislative intent as to whether or how the codified rights to record would apply therein.

courts had already located in the First Amendment.  As explained in the "justification" statement included in the State RTRA bill jacket,

> Several Federal Circuit Courts, the First, Seventh, Ninth, and Eleventh Circuits, have issued clear and consistent opinions finding that the First Amendment of the United States Constitution openly confers and protects the rights of ordinary citizens to record police activity.  The right of people to document the public activities of law enforcement helps to ensure that the police and others engaged in law enforcement activities are accountable to the public.

N.Y. Senate Introducer's Mem. in Support, Bill Jacket, L. 2020, ch. 100 at 5.[16]

An intent to afford state law protection to a right already afforded by the federal Constitution finds further support in legislative debates.  *See, e.g.,* N.Y. Assembly Debate on Senate–Assembly Bill S3253-A, A1360-A (June 8, 2020) at 101–02 (Statement of Assemblymember Perry)  (stating that RTRA "affirm[s] . . . the Constitutionality of the right" to record law enforcement activities); *id.* at 107 (Statement of Assemblymember Perry) (stating that evidence showing "blatant misbehavior by the police" is "why we need to assert this Constitutional right"); *id.* at 118 (Statement of Assemblymember Perry) ("The constitutional right to monitor is a sacred constitutional right . . . [that the RTRA] will codify."); *id.* at 129 (Statement of Assemblymember Rodriguez) ("In a free and open Democratic society we have to affirm this Constitutional right."); *id.* at 130 (Statement of Assemblymember Colton) ("This bill basically affirms the Constitutional right that everyone has to take a video.").  Similarly, upon introducing the City RTRA in 2018, its sponsor, Council Member Jumaane Williams, stated that the local law "does not

---

[16] Neither this court nor the Supreme Court has yet recognized a First Amendment right to record law enforcement activities.  We do not address that question further in this opinion.

create any new rights." N.Y. City Council, Transcript of the Minutes of Stated Meeting, March 7, 2018. These statements, however, do little to help us predict whether the New York Court of Appeals would look to the First Amendment in construing either RTRA because that Court accords the statements of individual legislators—as opposed to pronouncements made in the formal bill jacket—little, if any, weight in construing statutes. *See Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 586 (1998) (instructing that "statements and opinions of legislators uttered in the debates are not competent aids to the court in ascertaining the meaning of statutes" (internal quotation marks omitted)).[17]

In any event, as we have recognized, "state courts are not bound to interpret state laws in accordance with federal court interpretations of analogous federal statutes" or constitutional provisions, although "they may choose to do so." *McGrath v. Toys "R" Us, Inc.*, 356 F.3d at 250. Even assuming the quoted legislative history might prompt the New York Court of Appeals to look to First Amendment jurisprudence to construe the RTRAs, it would not be compelled to do so. Thus, we cannot confidently predict whether that court would cabin the RTRA therein to spaces and facilities open to the public or subject them to the sort of time, manner, and place limits sometimes tolerated by the First Amendment. *See generally Kass v. City of New York*, 864 F.3d 200, 207–08 (2d Cir. 2017) ("The First

---

[17] In subsequent, separate federal litigation, Council Member Williams stated that the City RTRA was intended to protect people's right to record "wherever they interacted with police," which included "the public spaces of a police station." Declaration of NYC Public Advocate Jumaane Williams in Opposition to Defendants' Motion to Dismiss, ECF 55-1 at 31, *Rodney v. City of New York et al.*, 22-CV-1445 (S.D.N.Y. Nov. 1, 2022)). The New York Court of Appeals has instructed that statements made after a law's enactment, which therefore were "no part of the legislative process, [are] not entitled to consideration as legislative history." *Matter of Lorie C.*, 49 N.Y.2d 161, 169 (1980).

Amendment, however, does not guarantee the right to communicate at all times and places or in any manner that may be desired. The extent to which the government may permissibly restrict such communications depends in part upon the circumstances under which those communications and the receipt of those communications occur." (alteration, citation, and internal quotation marks omitted)).

On the other hand, some legislative history might be read to suggest an intent for the codified rights to record to be cabined only by the texts' physical interference and obstruction caveats. For example, the State RTRA's "purpose" statement—found just above the above-quoted "justification" in the bill jacket—pronounced an intent "to unambiguously affirm, by statutory enactment, the right of New Yorkers to record, *with expressed exceptions*, the actions of persons acting under the color of law." N.Y. Senate Introducer's Mem. in Support, Bill Jacket, L. 2020, ch. 100 at 5 (emphasis added). Even more emphatically, in floor debate, Assemblymember Perry stated, "What we are concerned about as lawmakers and as citizens is abuse, abuse of power, violation of citizen's right, the right to monitor *to the greatest extent* as long as—so long as you do not interfere with the police activity." N.Y. Assembly Debate on Senate–Assembly Bill S3253-A, A1360-A (June 8, 2020) at 112 (emphasis added). Would this history prompt the New York Court of Appeals to construe the RTRAs to apply to all police activities, wherever occurring, whomever involving, and subject to no time, manner, and place limits so long as there was no physical interference with or obstruction of the police activities?

Because we cannot confidently answer that question, we conclude that certification is the best path to decide this appeal.[18]

## C. Public Interest

In opposing Reyes's motion for a preliminary injunction, the City offered evidence from an NYPD Captain and an NYPD attorney that allowing video recording inside police stationhouses risks the privacy and safety of numerous people conducting sensitive business therein, including arrestees, crime victims, witnesses, informants, and undercover officers. These concerns are matters of significance to the public's interest in responsible and effective law enforcement. The district court credited this evidence but, nevertheless, found that the asserted "privacy, security and safety concerns" did not outweigh the public interest in "the enforcement of

---

[18] In any event, construing the RTRAs to afford "the right to monitor to the greatest extent" not interfering with or obstructing police activity, as Assemblymember Perry stated, raises a number of questions for which statutory text, context, and history admit no easy answers: Does the right apply to law enforcement activity occurring on private as well as government premises? Does the right apply even if one is not lawfully on the premises where the recorded police activity is taking place so long as one does not interfere with or obstruct that activity? What exactly constitutes "law enforcement activity," N.Y. Civ. Rights Law § 79-p(2), or "official and lawful police function," N.Y.C. Admin. Code § 14-189(b)? Does it include giving testimony in court, so as to afford a right to record such testimony? Does a person have a right to record police activity occurring in non-publicly accessible premises if he can see the activity with a camera lens? *E.g.,* a crime victim being interviewed in his home or an informant in a private police interview room? While these questions are not here at issue, the reasoning employed in deciding whether the RTRAs do or do not afford a right to record in police stationhouse lobbies that precludes enforcement of the challenged Anti-Recording Policy may well inform how these questions are answered in the future. This reinforces our decision to certify the state law question at issue in this case to the New York Court of Appeals.

34

clear laws duly passed by elected state and city officials." *Reyes v. City of New York*, 2023 WL 7212192, at \*12. The district court observed that recording police activities and providing access to such recordings "is particularly important because it leads to citizen discourse on public issues," *id.* (internal quotation marks omitted), most obviously, the issue of professional and lawful police conduct.

Whether or not the district court acted within its discretion in so balancing competing public interests necessarily depends on whether the RTRAs are correctly construed to afford a right to record police activities occurring not only on public streets but also inside premises, specifically, the publicly accessible lobbies of police stationhouses. If the laws are correctly construed to obtain inside stationhouse lobbies, that reflects a controlling policy choice by the legislatures to place the right to record (and, therefore, to scrutinize) police activities above the safety and privacy concerns here raised by the City. But, if the laws are correctly construed more narrowly, then it is possible—depending on how narrowly—that the City's concerns might tilt the public-interest balance in its favor.

For reasons stated in the preceding section, we do not think the RTRAs' texts, contexts, or legislative histories clearly speak to whether the codified rights to record obtain inside police stationhouses, and we cannot confidently predict how New York's highest court would answer that question. This cautions against us here reaching any conclusion as to Reyes's satisfaction of the public-interest or the success-on-the-merits requirements for the challenged injunction. Rather, we defer further consideration of this appeal in order to seek guidance from the New York Court of Appeals as to the proper construction of the RTRAs.

35

## IV. Certification to the New York Court of Appeals

Under the rules of this court and the courts of New York, we are permitted to certify to the New York Court of Appeals "determinative questions of New York law . . . involved in a case pending before [our] court for which no controlling precedent of the Court of Appeals exists." N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a); 2d Cir. R. § 27.2(a); *see, e.g., Nitkewicz v. Lincoln Life & Annuity Co. of N.Y.*, 49 F.4th 721, 728–29 (2d Cir. 2022), *certified question answered*, 40 N.Y.3d 349 (2023). In deciding whether certification is appropriate, we consider whether the question of New York law at issue before us: (1) has yet been addressed by the New York Court of Appeals, (2) "is of importance to the state and may require value judgments and public policy choices," and (3) "is determinative of a claim before us." *Gov't Emps. Ins. Co. v. Mayzenberg*, 121 F.4th 404, 420 (2d Cir.), *certified question accepted*, 42 N.Y.3d 1044 (2024) (internal quotation marks omitted). In this case, all three factors weigh in favor of certification.

First, and as already noted *supra* at 23–24, we have identified no decision by the New York Court of Appeals—or any New York court— interpreting either the State or City RTRA, much less doing so in a context akin to the one now before us, *i.e.*, recording law enforcement activities inside police stationhouses. Nor has any party cited a case that, either because it construes an analogous statute or arises in analogous circumstances, might allow us to predict how the New York Court of Appeals would construe the RTRAs as they pertain in this case. Thus, this first factor weighs in favor of certification.

Second, as this court recognizes, "New York has a fundamental interest in interpreting its own statutes." *Nitkewicz v. Lincoln Life & Annuity*

36

*Co. of N.Y.*, 49 F.4th at 729. That interest is particularly weighty here because both the laws in question and the challenged Policy concern law enforcement: how it can be conducted effectively by those charged with that task and how it can be scrutinized by the public that it affects. *See United States v. McCargo*, 464 F.3d 192, 200 (2d Cir. 2006) (recognizing "important [state] interest in police and public safety"); *In re K.L.*, 1 N.Y.3d 362, 371 (2004) (recognizing New York's "compelling interests in both its police and *parens patriae* powers"). As the district court recognized, codifying a right to record can promote government transparency and accountability, which in turn can encourage law enforcement that is both effective and respectful of individual rights. At the same time, however, affording such a right to record anywhere and everywhere police activities occur—including inside the publicly accessible areas of police stationhouses—can pose risks to the privacy and safety of persons therein, whether undercover officers, crime victims, witnesses, confidential informants, or others engaging with authorities therein on sensitive matters. A court construing the RTRAs thus must be mindful of these competing public interests in seeking to identify and maintain the particular balances struck by the enacting legislatures and in determining the effect of those laws on the challenged Anti-Recording Policy. To the extent this task implicates value judgments and public policy choices that can affect the conduct of law enforcement in New York, it is best performed by the state's highest court. Thus, this second factor also weighs strongly in favor of certification.

Finally, the question we here certify to the New York Court of Appeals is dispositive of this appeal—and likely of Reyes's RTRA claims in their entirety. If the New York Court of Appeals were to construe the

37

RTRAs not to grant a right to record law enforcement activities inside the publicly accessible lobbies of police stationhouses, then Reyes cannot succeed on the merits of his state law claims, requiring us to vacate the challenged preliminary injunction. Indeed, if the Court of Appeals were so to construe the RTRAs, then, barring settlement, the district court might well also have to dismiss Reyes's RTRA claims at an appropriate dispositive juncture. But, if the Court of Appeals were to construe the RTRAs sufficiently broadly to afford Reyes a right to record inside the publicly accessible lobbies of police stationhouses, then we would uphold the injunction, the district court having correctly found him to have carried both his merits and public interest burdens. In that event too, the Court of Appeals's answer could be dispositive on the merits of Reyes's RTRA claims and support a final judgment in his favor.

In sum, all three factors support certification.

## CONCLUSION

For the foregoing reasons, we **CERTIFY** the following question to the New York Court of Appeals:

> Does either N.Y. Civ. Rights Law § 79-p or N.Y.C. Admin. Code § 14-189 afford individuals such as plaintiff Reyes the right to video record law enforcement activities inside public facilities—specifically, inside the publicly accessible lobbies of police stationhouses—notwithstanding a New York City Police Department policy forbidding any video recording inside its facilities?

The New York Court of Appeals may reformulate or expand the certified question as it deems appropriate to address any further pertinent questions of New York law involved in this appeal. This panel retains

38

jurisdiction to decide the case once the New York Court of Appeals has either provided us with its guidance or declined certification.

It is hereby **ORDERED** that the Clerk of this Court transmit to the Clerk of the New York Court of Appeals a certificate in the form attached, together with a copy of this opinion and a complete set of briefs, appendices, and the record filed by the parties in this Court.  Decision is **RESERVED**.

## CERTIFICATE

The foregoing is hereby certified to the Court of Appeals of the State of New York pursuant to 2d Cir. R. 27.2(a) and N.Y. Comp. Codes, R. & Regs tit. 22, § 500.27(a), as ordered by the United States Court of Appeals for the Second Circuit.